No. 33          September 26, 2024          729

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

DENNIS GIRON-CORTEZ,
*Petitioner on Review.*

(CC 19CR58813, 14C41397, 17CR58804)
(CA A173814 (Control), A173813, A173815) (SC S069941)

En Banc

On review from the Court of Appeals.*

Argued and submitted September 12, 2023.

David Ferry, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for petitioner on review. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section.

E. Nani Apo, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

MASIH, J.

The decision of the Court of Appeals is reversed. The judgment of conviction is reversed in part, and the case is remanded to the circuit court for entry of conviction for the lesser-included offense of fourth-degree assault under ORS 163.160(1)(a) and for resentencing consistent with this opinion.

James, J., dissented and filed an opinion, in which Bushong, J., joined.

_____
* Appeal from Marion County Circuit Court,  Lindsay Partridge, Judge. 322 Or App 274, 519 P3d 879 (2022).

### MASIH, J.

A person commits the crime of assault in the third degree under ORS 163.165(1)(c) by "[r]ecklessly caus[ing] physical injury to another by means of a deadly or dangerous weapon under circumstances manifesting extreme indifference to the value of human life." In this case, we consider the meaning of the "extreme indifference" element of that crime.

Following a bench trial, the trial court concluded that defendant acted recklessly with "extreme indifference to the value of human life" based on evidence that he brought a loaded handgun to a crowded bar, displayed the handgun flat in the palm of his hand with no fingers on the trigger while the barrel faced in the general direction of others, and then unintentionally discharged the gun as he put it back in his waistband with the barrel pointed downward. The bullet hit defendant in the leg and ricocheted into his cousin's foot, causing physical injury. Defendant appealed, arguing that the trial court should have granted his motion for judgment of acquittal (MJOA) for third-degree assault because his conduct—which he concedes was reckless—did not meet the legal standard for "extreme indifference to the value of human life." The Court of Appeals disagreed and affirmed. *State v. Giron-Cortez*, 322 Or App 274, 519 P3d 879 (2022). Defendant then sought review in this court, which we allowed.

As we will explain, there is no dispute that this case involves reckless conduct with a deadly weapon. However, the text, context, and legislative history of ORS 163.165(1)(c) indicate that the legislature did not intend for all reckless use of a deadly or dangerous weapon to constitute "extreme indifference to the value of human life." Rather, the legislature associated "extreme indifference" with conduct that presents a greater risk to the lives of others than the "substantial and unjustifiable risk" posed by ordinary recklessness and intended the requirement to apply to only the most serious forms of life-endangering conduct. In the context of firearms, the legislature associated "extreme indifference" with conduct such as shooting a firearm in the direction and range of other people or, at least, as relevant here, conduct that materially increases the risk of an accidental discharge

in the direction and range of others beyond the risk inherent in handling and displaying a loaded gun.

As a matter of law, the conduct in this case falls short of the "extreme indifference" standard. Accordingly, we reverse the decision of the Court of Appeals, reverse in part the judgment of conviction of the trial court, and remand for entry of conviction for the lesser-included offense of fourth-degree assault under ORS 163.160(1)(a) and for resentencing consistent with this opinion.[1]

## I.    FACTUAL BACKGROUND

Because the issue on review arises from the trial court's denial of defendant's MJOA, we describe the facts in the "light most favorable to the state" to determine whether the state presented sufficient evidence from which a rational factfinder, making reasonable inferences, could find the elements of the crime beyond a reasonable doubt. *State v. Hedgpeth*, 365 Or 724, 730, 452 P3d 948 (2019).

Surveillance footage (without audio) introduced at defendant's trial showed defendant at a bar with approximately 20 other patrons on the night of the charged assault. He was seated at a high-top table with two other people. Defendant sat facing most of the other patrons in the bar, and several patrons were seated nearby to defendant's left. Another man stood to the right of defendant's chair, conversing with defendant. There were two empty pitchers and three empty glasses on the table.

Defendant began speaking animatedly, gesturing frequently with his hands. Approximately 30 seconds later, defendant lifted up his shirt and removed a handgun from his elastic waistband. For approximately seven seconds, defendant held the handgun flat in the palm of his hand for others to see. During that period, the barrel faced in the general direction of others, including the ultimate victim.

---

[1] Defendant raises two other issues on review that challenge the application of the additional "use *** of a firearm" element under ORS 161.610(2) to the third-degree assault conviction, and the resulting sentencing enhancement. ORS 161.610(2) applies only to felonies. Because we remand for entry of conviction for the lesser-included offense of fourth-degree assault—a misdemeanor—the firearm enhancement provision does not apply and we need not address the remaining issues.

Even viewing the evidence in the light most favorable to the state, however, defendant's fingers were never on the trigger during those seven seconds. As he brought the handgun back toward his waistband, with the barrel pointed down toward the floor and both hands on the handgun, defendant's fingers appear to move toward the trigger, and the handgun discharged. Defendant quickly returned the handgun to his waistband before collapsing, and then one of the other people at the table with defendant appeared to take the handgun and leave the bar. Police determined that the bullet had entered defendant's left leg, ricocheted off his thigh bone, and gone through his cousin's foot.

## II.   PROCEDURAL HISTORY

Defendant was charged with one count of third-degree assault (involving the "use" of a firearm) under ORS 163.165(1)(c) and ORS 161.610(2), and with one count of felon in possession of a firearm under ORS 166.270 and ORS 161.610(2).[2] He was also charged with 10 counts of recklessly endangering another person under ORS 163.195 (providing that a person commits the crime of reckless endangerment "if the person recklessly engages in conduct which creates a substantial risk of serious physical injury to another person").

Defendant waived his right to a jury, and the case proceeded to a bench trial. The state's case primarily consisted of the bar surveillance footage. After the state rested, defendant combined his closing argument with an MJOA, challenging the sufficiency of the state's evidence on the third-degree assault charge.[3]

As part of his MJOA, defendant did not dispute that the evidence was sufficient to infer that his conduct was

_____

[2] Defendant was previously convicted of a felony. It is unlawful for "[a]ny person who has been convicted of a felony under the law of this state or any other state, or who has been convicted of a felony under the laws of the Government of the United States" to own, possess, or have in the person's custody or control any firearm. *See* ORS 166.270 (describing the criminal offense of felon in possession of a firearm).

[3] The trial court construed defendant's arguments during closing as an MJOA, as do we. *See State v. Gonzalez-Valenzuela*, 358 Or 451, 454 n 1, 365 P3d 116 (2015) (agreeing "with the long-standing case law from the Court of Appeals that," when a defendant opts for a bench trial, a challenge to the legal sufficiency of the state's evidence during closing argument can be "the equivalent of a motion for judgment of acquittal" for preservation purposes).

reckless or that he caused physical injury to another using a deadly or dangerous weapon. He argued only that evidence of the accidental discharge was insufficient to establish that he acted recklessly "under circumstances manifesting extreme indifference to the value of human life."

The trial court disagreed and denied defendant's motion. Although the court found that defendant had unintentionally fired the handgun, it nevertheless determined that defendant had acted recklessly with "extreme indifference." The court emphasized that defendant had knowingly possessed a firearm even though he was not allowed to do so following his prior felony conviction. And the court noted that the handgun had been loaded, that the bar had been full of people, and that defendant had pulled out the handgun to show it off. The court ultimately found defendant guilty of third-degree assault (Count 2), eight counts of recklessly endangering another person (Counts 3 through 10), and one count of felon in possession of a firearm (Count 1). Defendant was sentenced to 120 months in prison for the third-degree assault count, a concurrent 30-month sentence for the felon in possession of a firearm count, and a sentence of conditional discharge on the reckless endangerment counts.[4]

Defendant appealed, renewing his challenge to the sufficiency of the evidence. The Court of Appeals affirmed, rejecting defendant's characterization of his handling of the handgun as merely "reckless." *Giron-Cortez*, 322 Or App at 279. The court concluded that a factfinder could reasonably conclude that defendant's fingers were "near the trigger of a loaded gun as he brought the gun above the table and moved the gun around so that it pointed at multiple people," which in turn was legally sufficient to establish extreme indifference to the value of human life. *Id.*

Defendant sought review in this court, which we allowed.[5]

---

[4] On review, defendant does not challenge his convictions for reckless endangerment or felon in possession of a firearm. Our disposition in this case does not disturb defendant's convictions on those other aspects of the trial court's judgment.

[5] Three cases were consolidated on appeal. One case involved defendant's judgment of conviction, and the other two cases involved the revocation of defendant's probation in two other cases. Although we allowed review of all three

### III.  THE PARTIES' ARGUMENTS

As noted, defendant concedes that he recklessly caused physical injury using a deadly or dangerous weapon. The only question is whether that conduct occurred under circumstances demonstrating defendant's extreme indifference to the value of human life, as required for third-degree assault under ORS 163.165(1)(c).

On review, defendant argues that "extreme indifference to the value of human life" requires evidence that his conduct created a "substantial likelihood" of causing death and an "extreme lack of concern" about that likelihood. Defendant maintains that the state must prove that defendant disregarded a specific and genuine risk of killing someone, and that that standard is established only when a person "kill[s] or nearly kill[s] anyone."

Defendant also urges us to focus on his conduct at the precise time that the injury occurred—the discharge. He contends that an *accidental* discharge of a handgun into his own leg, while the barrel was beneath the table and pointing down, cannot give rise to a finding of "extreme indifference"—especially absent evidence demonstrating his willingness to commit an "extremely dangerous act" such as playing with the trigger, spinning the handgun, or intentionally shooting into the crowd. And he argues that, even if we consider his conduct immediately prior to the discharge, including momentarily holding a loaded handgun so that it recklessly pointed at others, that evidence is insufficient to establish "extreme indifference."

In the state's view, it is not required to establish that defendant's conduct created a "substantial likelihood" of death, because the "extreme indifference" analysis focuses on the defendant's disregard or lack of concern for the risk that death might occur, rather than the actual likelihood that a loss of human life will, in fact, occur. According to the state, the inherent increased risk of serious injury or death posed by firearms means that most cases involving the reckless discharge of a firearm will at least present a

_____

consolidated cases, defendant's arguments on review challenge only his judgment of conviction for third-degree assault. Our disposition in this case does not disturb the trial court's probation revocation judgments in the other two cases.

question of fact for the factfinder as to whether a defendant's conduct manifests "extreme indifference." And the state disagrees with defendant that the discharge is the only relevant temporal moment for assessing defendant's mental state, instead arguing that defendant's conduct is evaluated in light of the surrounding circumstances.

## IV.   ANALYSIS

The parties dispute whether the trial court erred when it denied defendant's MJOA, having determined that the evidence was sufficient to permit defendant's conviction for third-degree assault under ORS 163.165(1)(c). When we consider whether a trial court erred in denying an MJOA, our task is to determine whether the evidence, viewed in the light most favorable to the state, was sufficient to find that all the elements of the offense were satisfied. That task— answering whether the state presented sufficient evidence from which a rational trier of fact, making reasonable inferences, could find the essential elements of the crime beyond a reasonable doubt—is a legal one, for which we review the trial court's denial of the motion for errors of law. *See State v. Haley*, 371 Or 108, 112, 531 P3d 142 (2023).

In this case, the parties' dispute centers on the meaning of one element of the offense—namely, whether defendant acted with "extreme indifference to the value of human life." To resolve that dispute, we must determine the meaning of the term "extreme indifference" as used in ORS 163.165(1)(c). That is a matter of statutory interpretation, for which we employ the analytical framework described in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), and modified in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009). As with all questions of statutory interpretation, our "paramount goal" is to give effect to the intent of the legislature as demonstrated by the text, context, and any helpful legislative history. *Gaines*, 346 Or at 171-72; *see also* ORS 174.020(1)(a) ("In the construction of a statute, a court shall pursue the intention of the legislature if possible.").

## A.   *Text and Context*

We begin by analyzing the statute's text in context, giving "primary weight to the text and context of the disputed

statutory terms." *City of Portland v. Bartlett*, 369 Or 606, 610, 509 P3d 99 (2022) (internal quotation marks omitted); *Gaines*, 346 Or at 171-72. A statute's context includes other provisions of the same or related statutes. *Ogle v. Nooth*, 355 Or 570, 584, 330 P3d 572 (2014) (so stating).

As we will first explain, the statute's text and context indicate that the legislature did not intend for all reckless use of a deadly weapon to constitute "extreme indifference to the value of human life." Instead, the text and context show that the legislature created different provisions for a range of conduct involving reckless use of firearms—each serving its own purpose and designed to be considered together.

ORS 163.165 defines the crime of third-degree assault and, as pertinent here, specifies three ways to commit that offense with a "reckless" mental state:

> "A person commits the crime of assault in the third degree if the person:
>
> "(a)  Recklessly causes serious physical injury to another by means of a deadly or dangerous weapon;
>
> "(b)  Recklessly causes serious physical injury to another *under circumstances manifesting extreme indifference to the value of human life*;
>
> "(c)  Recklessly causes physical injury to another by means of a deadly or dangerous weapon *under circumstances manifesting extreme indifference to the value of human life*[.]"

(Emphases added.)

We note that the plain text of ORS 163.165(1)(c) shows that the "circumstances manifesting extreme indifference" must exist *in addition to* the fact that a person recklessly caused physical injury with a deadly or dangerous weapon. In other words, the legislature added an element—"extreme indifference"—to differentiate between types of reckless conduct involving firearms. Thus, the legislature did not intend that all reckless conduct causing physical injury *even with a deadly weapon* would suffice to show such "extreme indifference." That distinction—between reckless use of a deadly weapon that constitutes "extreme indifference to the

value of human life" and reckless use of a deadly weapon that does not—finds support in the statutory context.

Such support is found in the other forms of third-degree assault that are committed "recklessly." If all reckless use of a deadly weapon constituted "circumstances manifesting extreme indifference to the value of human life," ORS 163.165(1)(a) would be subsumed by ORS 163.165(1)(b). That is, if, when a person recklessly causes serious physical injury with a deadly weapon under paragraph (1)(a), the person is also recklessly causing serious physical injury under circumstances manifesting "extreme indifference," then there would be no need for paragraph (1)(a) because the conduct would be covered by paragraph (1)(b). That construction would render paragraph (1)(a) superfluous. We have explained that, "if possible, we should avoid interpreting statutory enactments in a way that makes parts of them superfluous or redundant." *See DISH Network Corp. v. Dept. of Rev.*, 364 Or 254, 278, 434 P3d 379 (2019).

Related statutes also provide contextual support for our understanding that the legislature did not intend for all reckless use of a deadly weapon to manifest "extreme indifference." If a person "recklessly causes physical injury to another," absent evidence that the person acted recklessly "under circumstances manifesting extreme indifference," that person commits the crime of assault in the fourth degree. ORS 163.160(1)(a).[6] And if a person "recklessly engages in conduct which creates a substantial risk of serious physical injury to another person," but which does not cause physical injury, the person commits the crime of recklessly endangering another person. ORS 163.195. Reckless endangerment is, as we explain later, a crime intended by the legislature to cover the reckless pointing of firearms. As noted, defendant was found guilty of eight counts of reckless endangerment, and defendant does not challenge those convictions nor dispute that he handled the handgun "recklessly." He disputes only that his reckless conduct manifested "extreme indifference."

---

[6] Fourth-degree assault under ORS 163.160(1)(a) is a lesser-included offense of third-degree assault under ORS 163.165(1)(c).

The question, then, is how the legislature intended to distinguish the reckless use of a deadly weapon with "extreme indifference to the value of human life" from the reckless use of a deadly weapon that does not meet that standard. As we will next explain, the legislature intended for recklessness with "extreme indifference" to encompass only the "highest or the greatest possible degree" of lack of concern for the risk that a defendant's conduct might cause the death of another person.

In *State v. Boone*, 294 Or 630, 635, 661 P2d 917 (1983), this court explained that recklessness with "extreme indifference" is a standard that "contemplates circumstances which make defendant more blameworthy than recklessness alone."[7] This court has also described recklessness with "extreme indifference to the value of human life" as another "level[]" of recklessness. *State v. Hill*, 298 Or 270, 280, 692 P2d 100 (1984). Thus, the statutory reference in ORS 163.165(1)(c) to "extreme indifference" essentially contemplates greater and lesser degrees of recklessness.

ORS 161.085(9)—which defines the mental state of "recklessly"—is one of the general culpability provisions adopted by the legislature. As such, that statute can be used to help differentiate typical reckless use of a deadly weapon from reckless use of a deadly weapon with "extreme indifference to the value of human life." *See State v. Haltom*, 366 Or 791, 797, 472 P3d 246 (2020) (stating as a "core principle[]" that statutes defining offenses are read in the context of the Oregon Criminal Code's general culpability provisions to determine applicable mental states). "Recklessly" relates to a result or circumstance described by a statute defining an offense, and is defined, in relevant part, to mean

---

[7] Although *Boone* was decided before *PGE* and *Gaines* and therefore did not follow the methodology for construing statutes that we adopted in those cases, our examination of the statutory term's text, context, and legislative history persuades us that our interpretation of the term in *Boone* remains sound. *See generally Mastriano v. Board of Parole*, 342 Or 684, 692, 159 P3d 1151 (2007) (stating that the "absence of a *PGE*-style examination of legislative intent does not deprive a prior statutory interpretation of its ordinary effect as a precedent," and therefore a decision from this court interpreting a statute cannot be discounted merely because it predates *PGE*); *see also State v. Riley*, 365 Or 44, 55, 443 P3d 610 (2019) (reaffirming that principle post-*Gaines*). And neither party has asked us to revisit our analysis or holding in *Boone*.

"that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

ORS 161.085(9). When determining what the mental state element requires of the state's proof for a particular charge, "the starting point is to identify the result, conduct, or circumstance 'described' by the statute setting out the elements of the offense." *State v. Turnidge (S059155)*, 359 Or 364, 460-61, 374 P3d 853 (2016), *cert den*, 580 US 1070 (2017). Here, for third-degree assault under ORS 163.165(1)(c), defendant must have been "aware of and consciously disregard[ed] a substantial and unjustifiable risk" of causing a result—"physical injury by means of a deadly or dangerous weapon."

The "recklessly" element in ORS 163.165(1)(c), when read together with the definition of recklessly in ORS 161.085(9), thus requires the state to establish that defendant was reckless as to the "substantial and unjustifiable" risk of causing physical injury with a deadly or dangerous weapon. But, in addition, the state must prove that defendant acted recklessly "under circumstances manifesting extreme indifference to the value of human life." ORS 163.165(1)(c) thus requires the state to establish the "additional element" of "extreme indifference." *See Boone*, 294 Or at 632 (so stating for second-degree assault under ORS 163.175(1)(c)). That additional element necessarily involves defendant's "extreme" lack of concern for the substantial risk that his conduct might result in another person's death, a standard that the legislature intended to go well beyond ordinary reckless assault.[8]

Neither "extreme indifference to the value of human life" nor the circumstances that may manifest the requisite

---

[8] We disagree with defendant, however, that the requisite "extreme" lack of concern for the substantial risk that a person's conduct might result in another person's death is satisfied only when there is evidence that a person's conduct actually results in "kill[ing] or nearly kill[ing] anyone." That argument is not supported by the text. The text of ORS 163.165(1)(c) requires only the result that the victim suffer from a "physical injury." But, the type of injury that could have resulted is relevant to whether the defendant was acting with extreme indifference to the value of human life.

indifference are defined in statute. When the legislature has not defined a particular term, we assume that the legislature intended to give words of common usage their "plain, natural, and ordinary meaning." *State v. Clemente-Perez*, 357 Or 745, 756, 359 P3d 232 (2015) (citing *PGE*, 317 Or at 611).

The definition of "extreme" is "existing in the highest or the greatest possible degree : very great : very intense" or "exceeding the ordinary." *Webster's Third New Int'l Dictionary* 807 (unabridged ed 2002). "[I]ndifferent" means "marked by a total or nearly total lack of interest in or concern about something." *Id.* at 1151. "[V]alue," in terms of "the value of a thing" or "the precise value of men," means "relative worth, utility, or importance : degree of excellence : status in a scale of preferences." *Id.* at 2530. And "life" is "compare[d] [with] DEATH" and is defined in part as "the quality that distinguishes a vital and functional being from a dead body." *Id.* at 1306.

The legislature's choice of words indicates that it intended to set a high bar for proving "extreme indifference to the value of human life." The plain, natural, and ordinary meaning of the disputed term can generally be understood to describe circumstances that demonstrate the "highest" or "greatest" lack of concern that a person's conduct could result in the death of a human being.

Importantly, as we explained in *Boone*, "[i]t is not the 'circumstances' that manifest extreme indifference but rather it is the conduct of a defendant [under those circumstances] that manifests [that person's] extreme indifference."[9] 294 Or at 634 n 8. Thus, to determine whether a

---

[9] The dissent characterizes the "extreme indifference" element as a "circumstance" element, and states that, under the general culpability provision set out in ORS 161.085(9), the state need only prove that defendant was "reckless as to the existence of the circumstance" for ORS 163.165(1)(c). 372 Or at 753 (James, J., dissenting). There are at least two problems with the dissent's approach. First, this court has already held that "extreme indifference" is essentially another "level[] of recklessness." *Hill*, 298 Or at 280. The dissent's reliance on the general culpability provisions thus disregards the fact that this court has already observed that statutes using the "extreme indifference" concept operate differently than statutes that use the recklessness mental state alone.

Second, as a practical matter, the dissent's approach does not make sense. Under the dissent's view, because the statute uses the term "extreme indifference" in conjunction with the word "circumstances," extreme indifference must be treated as a *circumstance element*. And, under the general culpability provisions

defendant's conduct manifests recklessness with "extreme indifference," this court considers "circumstances surrounding the conduct" that inform the nature of the risk to human life involved and the extent to which a defendant consciously disregarded that risk. *Id.* Contrary to defendant's argument, this court considers circumstances beyond the precise moment that defendant creates a risk of harm, including the circumstances before, during, and after the resulting injury or death. *See id.* at 634.

With that understanding of the statutory term in mind, we reiterate our comment in *Boone* that attempting to further "defin[e] extreme indifference to human life by analysis rather than anecdote is difficult." 294 Or at 637. We next look to examples from this court for additional guidance as to the type of conduct and surrounding circumstances that the legislature intended to capture within the meaning of recklessness with "extreme indifference." *See State v. Mullins*, 352 Or 343, 349, 284 P3d 1139 (2012) (explaining that case law construing statute at issue is considered at first level of *PGE* analysis) (citing *State v. Toevs*, 327 Or 525, 532, 964 P2d 1007 (1998)).

In *Boone*, the defendant was convicted of second-degree assault with "extreme indifference" for injuries that he caused when driving while intoxicated and with a suspended license.[10] *Id.* at 632-33. This court held that the state must first establish that the defendant was reckless—for second-degree assault under ORS 163.175(1)(c), the "commission of an extremely dangerous act" would constitute recklessness "because it entails 'substantial and unjustifiable

---

on which the dissent relies, the state must prove only that a defendant was reckless as to the existence of a circumstance. It follows that, under the dissent's interpretation, the state would have to prove that a defendant was "reckless" as to the existence of the defendant's own extreme indifference to the value of human life. Rather than adopt such an approach, we adhere to our interpretation in *Boone* that, although recklessness with "extreme indifference" is not an additional culpable mental state, the standard is best understood in terms of requiring indifference to a substantial risk to human life that is "more than recklessness." 294 Or at 634. And that requires us to focus on the conduct at issue under the surrounding circumstances.

[10] ORS 163.175(1)(c) provides that a person commits the crime of second-degree assault if the person "[r]ecklessly causes serious physical injury to another by means of a deadly or dangerous weapon under circumstances manifesting extreme indifference to the value of human life."

risk' of serious injury or death." *Id.* at 638. And that the evidence must go beyond that level of recklessness by establishing "evidence of circumstances from which the jury could have inferred defendant's extreme indifference to the value of human life." *Id.* at 638-39. In concluding that the defendant's conduct under the surrounding circumstances manifested the additional element, this court highlighted that he

- was swerving across the road prior to the accident;

- tailgated so closely that he almost hit a car in front of him;

- sideswiped an oncoming vehicle because he went across the center line;

- swerved back over the line into another oncoming vehicle, causing serious injury;

- had a .24 percent blood alcohol content two hours after the accident; and

- was so belligerent and intoxicated at the scene that he threatened to hit a passenger of a car that he sideswiped and interfered with ambulance assistance.

*Id.* at 639. We affirmed the defendant's conviction for second-degree assault, concluding that a reasonable factfinder could find that the defendant's conduct was distinguishable from a typical reckless assault case due to the "[t]he degree of intoxication, defendant's erratic driving and his conduct at the scene." *Id.*

Similarly, in *State v. Cunningham*, 320 Or 47, 880 P2d 431 (1994), this court considered the defendant's conduct under the surrounding circumstances in concluding that, if he acted recklessly, he did so under circumstances manifesting an extreme indifference to the value of human life. In *Cunningham*, the defendant was charged with murder. At the close of all the evidence, the trial court instructed the jury on the lesser-included crime of manslaughter in the first degree, which requires acting recklessly with "extreme indifference." *Id.* at 58. The defendant requested a jury instruction for the lesser-included offense of manslaughter in the second degree, which does not include the "extreme indifference" element. The trial court rejected the request.

As we explained in *Cunningham*, a requested jury instruction on a lesser-included offense should be given if there is "evidence, or an inference which can be drawn from the evidence, which supports the requested instruction so that the jury could rationally and consistently find the defendant guilty of the lesser offense and innocent of the greater." *Id.* (quoting *State v. Washington*, 273 Or 829, 835-36, 543 P2d 1058 (1975)). We affirmed the trial court's denial of the defendant's requested instruction, explaining that the evidence could not rationally support a finding that the defendant was reckless without inferring from all the evidence that his conduct also manifested an extreme indifference to human life, given that

- the autopsy showed that the victim had been stabbed approximately 37 times;

- the defendant admitted to police that he stabbed the victim, that she had a lot of blood on her, and that she had difficulty breathing; and

- the defendant dragged the victim into a ditch after observing her difficulty breathing and left her there.

*Id.* at 60-61.

Although those prior cases do not involve firearms, they do reflect our understanding that reckless assault under "circumstances manifesting extreme indifference to the value of human life" must go well beyond ordinary reckless assault and take into account circumstances before, during, and after the act that causes the harm.

B.   *Legislative History*

We next turn to the legislative history. Our review of that history reveals that in the particular context of firearms, the legislature associated "extreme indifference" with a blending of two factors—first, the conduct of actually shooting a firearm in the direction and range of others; and second, an awareness and conscious disregard of the risk of resulting injury or death.

The third-degree assault statute was created as part of the 1971 revision of Oregon's Criminal Code. Or Laws 1971, ch 743, § 92. However, the provision at issue here, ORS

163.165(1)(c), was added in 1977. Or Laws 1977, ch 297, § 3. Although the provision at issue was adopted later, the disputed term—"circumstances manifesting extreme indifference to the value of human life"—was first introduced into the Criminal Code in 1971. *See* Or Laws 1971, ch 743, § 94. The history and context of the 1971 legislature's adoption of the phrase are helpful in understanding what the legislature intended six years later when it enacted third-degree reckless assault with "extreme indifference."[11] *See Boone*, 294 Or at 635 (considering meaning of "extreme indifference" intended by the 1971 legislature while interpreting the second-degree assault provision enacted in 1977).

 The term "recklessly under circumstances manifesting extreme indifference to the value of human life" appeared in the 1971 versions of the criminal homicide and assault statutes. *See* Or Laws 1971, ch 743, §§ 88, 94. The Oregon Criminal Law Revision Commission, which drafted the statutes, intended the term to have a consistent meaning. *See* Minutes, Criminal Law Revision Commission, Jan 23, 1970, 6 (describing consistency in the meaning of the term). This court considers the commentaries produced by the commission and its subcommittees as part of the Criminal Code's legislative history. *Gaines*, 346 Or at 178.

 The meaning of "extreme indifference to the value of human life" is informed by the legislature's previous use of the term "depraved mind," which appeared in Oregon and a wide range of jurisdictions as a forerunner to the term "extreme indifference." *Boone*, 294 Or at 636. When the legislature created the crime of "reckless" murder with "extreme indifference," that crime was intended to replace *former* ORS 163.020, which defined second-degree murder to include killing by an act "imminently dangerous to others, and evincing a *depraved mind*, regardless of human

---

[11] We could find nothing in the legislative history of ORS 163.165(1)(c) to suggest that, in enacting the third-degree assault provision in 1977, the legislature intended to change the meaning of "extreme indifference to the value of human life" from how it was used in 1971. And the parties do not argue that the legislature changed the meaning of "extreme indifference" when it enacted ORS 163.165(1)(c) or at any point after the term was introduced into the Criminal Code. "[I]n the absence of evidence to the contrary, we ordinarily assume that the legislature uses terms in related statutes consistently." *State v. Cloutier*, 351 Or 68, 99, 261 P3d 1234 (2011).

life, although without any design to effect the death of any particular individual." (Emphasis added.); *see* Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 88, 86 (July 1970) (similar); *see also* General Laws of Oregon, Crim Code, ch XLIII, § 504, p 527 (Deady 1845-1864) (similar). The crime of reckless murder with "extreme indifference" was intended to correspond "fairly closely in policy" to that former second-degree murder statute that used the depraved-mind standard. Commentary § 88 at 87. Reckless murder with "extreme indifference" was also derived from Model Penal Code section 210.2(1). *Id.* at 86 (so stating). The Model Penal Code drew the "extreme indifference" term from many explicit statutory treatments and common-law decisions characterizing "extreme recklessness" as conduct without an intent to kill or injure, but nevertheless evidencing a "depraved heart regardless of human life." Commentary to Model Penal Code, Tentative Draft #9, 29, May 8, 1959.

"Depraved mind" was not defined in statute, but previous applications of the term give some insight into its meaning. Prior to 1971, courts applied iterations of the "depraved mind" standard to conduct involving the intentional shooting of firearms in the direction and range of others. In Oregon, a defendant showed a "depraved mind" sufficient to sustain a second-degree murder conviction based on evidence that he intentionally fired two rifle shots into a house that he knew was occupied at the time. *State v. Gill*, 3 Or App 488, 491, 474 P2d 23 (1970). Commentary to Model Penal Code section 210.2(1) includes comparable examples of shooting a firearm with recklessness as to the risk of injury or death, wherein the defendants' conduct presents a greater risk to human life than merely holding or displaying a firearm. *See, e.g.*, *Commonwealth v. Malone*, 354 Pa 180, 183, 188, 47 A2d 445, 447, 449 (1946) (the defendant had a "wicked, depraved, malignant heart" when he pulled the trigger of a loaded revolver at the victim during a game of Russian Roulette); *Myrick v. State*, 199 Ga 244, 249, 34 SE2d 36, 40 (1945) (whether the defendant displayed reckless disregard for human life by intending to shoot over the victim's head to scare him and hitting him by mistake was jury question); *People v. Jernatowski*, 238 NY 188, 192, 144

NE 497, 498 (1924) (conduct showed a "wicked and depraved mind regardless of human life" when the defendant fired several shots into an occupied house).

The commission gave similar examples for the term "extreme indifference." Professor Platt, in discussing the meaning of "extreme indifference" with members of the commission, stated that "extreme indifference" is "broad." Tape Recording, Criminal Law Revision Commission, Subcommittee 2, Nov 14, 1969, Tape 87, Side 1. He provided several hypothetical situations to help "illustrate the difference between homicide committed intentionally, knowingly, or recklessly with extreme indifference to the value of human life." *Id.*

Professor Platt gave one set of hypotheticals in which a person intentionally sets off a bomb that results in the death of other people. He explained that that situation could describe murder that is committed "intentionally" or "knowingly":

> "The defendant intentionally wants to kill A and to do this places a bomb in A's home and plans to wait until A is in the home to detonate the bomb. A walks into his home with B and the defendant sees B walk in with A. If he blows up the house and kills both A and B, he has intentionally murdered A and knowingly murdered B."

*Id.* He next changed the hypothetical to describe how the "intentionally" and "knowingly" examples would differ from an example of "reckless" murder under circumstances that would manifest "extreme indifference to the value of human life":

> "The defendant plans to kill A in the same fashion as outlined above. B has gone into the house previously and has not been seen by the defendant, yet the defendant is consciously aware that someone will be in the house (perhaps it is a motel room). If he blows up the house and kills A and B, not knowing for a certainty that he is going to kill B, the defendant has intentionally murdered A and in killing B has committed a reckless homicide with the indifference standard."

*Id.*

He also described another set of hypotheticals in which a person shoots a firearm across a highway. He explained that, if "someone shoots across a highway in a commercially developed area, it would be more like reckless murder with extreme indifference to the value of human life than where someone shoots across a seldom-used road." *Id.* In the latter instance, Platt stated that "it might not be homicide at all, even though someone is killed." *Id.*

The commission also gave other examples of "reckless" murder and assault with the use of a deadly weapon constituting "extreme indifference," all of which contemplate a defendant consciously placing the lives of others at risk by shooting a firearm, but without an intent to hit any particular person. The commission's commentary to the murder with "extreme indifference" provision states that the section "is meant to cover situations such as one shooting into a crowd or an occupied house or automobile." *See* Commentary § 88 at 87. The examples involve a person intentionally discharging a weapon and accidentally killing the victim. And the commentary to the first-degree assault with "extreme indifference" provision states that the section is "designed to cover the most serious forms of life endangering conduct," including "reckless conduct evincing extreme depravity, *e.g.*, shooting into a crowd without any specific homicidal intent." *See* Commentary § 94 at 94.

The subcommittee that drafted the homicide and assault statutes also created the statutory provision for the crime of recklessly endangering another person. That statute, which has remained unchanged since it was enacted in 1971, provides that a person commits the crime "if the person recklessly engages in conduct which creates a substantial risk of serious physical injury to another person." Or Laws 1971, ch 743, § 96; ORS 163.195.

The commentary for reckless endangerment provides two helpful notes: (1) the section "is intended to cover the reckless pointing of firearms," and (2) unlike the corresponding Model Penal Code section 211.2, Oregon's provision does not include the words "danger of death" because the commission felt such words were "redundant" in light of the definition of "serious physical injury." *See* Commentary

§ 96 at 97. The legislature appeared to recognize that the reckless act of pointing a firearm at another person is one that likely involves the risk of death, even without additional details about the likelihood that the firearm would discharge. The commentary indicates that, even recognizing the risk of death, the legislature intended for the pointing of firearms to constitute ordinary "reckless" conduct.

From the text, context, and legislative history, we reach the following conclusions. Most obviously, the legislature did not intend that all reckless use of firearms constitutes "extreme indifference to the value of human life." The reckless pointing of a firearm at another person was intended to be addressed by the reckless endangerment statute, which is inconsistent with a conclusion that reckless pointing of a firearm, without more, also qualifies as "extreme indifference." As to what would meet that standard, the legislative history suggests that the legislature had in mind only the most serious forms of life-endangering conduct, such as shooting a firearm, combined with recklessness as to the likelihood of resulting injury or death—as in the examples of firing into an occupied house or across a busy road. The context and history also suggest that acts that materially increase the risk of an unintentional discharge combined with recklessness as to the risk of injury or death—as in the Russian Roulette example—would meet the standard.

As noted, the state takes the position that, given the inherent dangers presented by loaded firearms, once the prosecution establishes that a defendant acted recklessly, whether the conduct rose to the level of "extreme indifference" will generally be a jury question. We understand the dissent to take essentially the same view. However, in this context, we conclude that the dissent's approach gives insufficient regard to the legislature's choices in structuring the third-degree assault statute and the reckless endangerment statute. Given the evident care with which the legislature considered how to address the use of "deadly weapons," we are persuaded that the legislature did *not* intend to allow a factfinder to find the additional element of "extreme indifference" to be present whenever the state proved that a

defendant had behaved recklessly with a deadly weapon. Rather, we conclude that, as a general matter, a finding of extreme indifference will require, at a minimum, conduct such as shooting a firearm in the direction and range of other people or, at least, as relevant here, conduct or circumstances that materially increase the risk of an accidental discharge in the direction and range of others, beyond the risk of discharge inherent whenever a person holds and displays a loaded weapon in public.

## V.  APPLICATION

Viewing the video evidence in the light most favorable to the state, a factfinder could reasonably infer that defendant brought a loaded handgun into a crowded bar. There was evidence of alcohol consumption, but the state on review does not argue that defendant was intoxicated or that his judgment was impaired by alcohol. He pulled the handgun out to show his friends. In so doing, defendant held it flat in the palm of his hand for approximately seven seconds, without his fingers on the trigger. While returning the handgun to his waistband with the barrel pointed down, defendant accidentally discharged it and recklessly caused physical injury to his cousin when the bullet ricocheted off his leg bone. As noted, the trial court found that defendant did not intentionally discharge the handgun.[12]

Without the conduct of shooting the handgun in the direction and range of others, the question becomes whether the evidence supports a finding that defendant created a materially increased risk of accidental discharge in a way that posed a risk of injury or death to others beyond the risk inherent in handling and displaying a loaded gun in public. We conclude that it does not.

Defendant pulled the handgun out for a few seconds to show his friends. He simply held it in the palm of his hand. He did not, for example, spin the handgun, wave it around

_____

[12] The dissent relies, in part, on the prosecutor's descriptions of defendant's gestures prior to taking out the handgun to conclude that defendant manifested an extreme indifference to the value of human life. 372 Or at 759-60, (James, J., dissenting). We note, however, that the trial court explicitly stated that it could not make the findings that the prosecutor argued for regarding defendant's non-verbal actions prior to pulling out the handgun.

in a drunken fashion, engage in a game of Russian Roulette, or otherwise play with it in a way that materially increased the risk of discharge and resulting injury or death. Nor did anything in the environment in which defendant displayed the gun create an enhanced risk of accidental discharge; for example, people in the immediate vicinity of defendant were not doing anything out of the ordinary physically that would elevate the risk of an accidental discharge. Moreover, at the time that defendant committed the assault—when he accidentally discharged the handgun—the barrel was pointed down and toward his own leg while he was returning it to his waistband. To be sure, holding the loaded handgun in a crowded place was inherently dangerous, but the inherent dangers associated with firearms are already accounted for in the structure of the statutory scheme. More is required to establish "extreme indifference to the value of human life." Without physical injury, defendant's conduct would constitute only reckless endangerment under ORS 163.195, and with physical injury, an assault in the fourth degree under ORS 163.160(1).

The state also argues that defendant's status as a felon is an indication of an "extreme indifference to the value of human life." *See Boone*, 294 Or at 639 n 15 (noting the defendant's suspended license when considering whether the defendant's impaired driving demonstrated extreme indifference). But even considering that that fact may be "an indication of an indifferent state of mind," *id.*, it is not sufficient to demonstrate an *extreme* indifference here in light of the other circumstances discussed above. Defendant's status as a felon did not materially increase the risk of accidental discharge that occurred. As noted, defendant was found guilty of the crime of felon in possession under ORS 166.270 for his conduct in this case. The legislature has not sought fit to connect the two statutes, and so we do not give that fact the same weight as the dissent.

Based on the foregoing reasons, we conclude that the trial court erred in denying defendant's motion for judgment of acquittal, because the evidence does not fall within the category of reckless use of a deadly weapon that constitutes

"extreme indifference," as required for third-degree assault under ORS 163.165(1)(c).

The decision of the Court of Appeals is reversed. The judgment of conviction is reversed in part, and the case is remanded to the circuit court for entry of conviction for the lesser-included offense of fourth-degree assault under ORS 163.160(1)(a) and for resentencing consistent with this opinion.

**JAMES, J.,** dissenting.

Defendant, a convicted felon, acquired an illegal handgun and, with a round in the chamber and the safety off or inoperable, tucked the weapon into his waistband and entered a small bar filled with patrons. After consuming alcohol, defendant withdrew that weapon in the crowded bar, displayed it to the people at his table with his finger on or near the trigger, necessarily aiming it at multiple patrons while doings so. While attempting to put the weapon back into his waistband, defendant accidentally discharged the handgun, wounding himself as well as another person at his table, and risking the lives of many more.

The question presented by this case is whether the trial court erred in denying defendant's motion for judgment of acquittal (MJOA) as to ORS 163.165(1)(c), assault in the third degree. That is, viewing the evidence in the light most favorable to the state, did the law prohibit a factfinder *from even considering* the allegation that defendant's reckless conduct was committed "under circumstances manifesting extreme indifference to the value of human life"? In my view, as a matter of law and commonsense, the answer to that question is no. The majority concludes otherwise, and for that reason, I dissent.

ORS 163.165(1)(c) provides that one, of the many, ways to commit assault in the third degree is when a defendant "[r]ecklessly causes physical injury to another by means of a deadly or dangerous weapon under circumstances manifesting extreme indifference to the value of human life." Understanding the function of the phrase "under circumstances manifesting extreme indifference to the value of

human life" in the statute requires an examination of how Oregon criminal statutes consider mental states.

The Oregon Criminal Code, ORS 161.085 (7) - (10), lists four possible mental states—intentional, knowing, reckless, and criminally negligent—for crimes in this state and specifies that each mental state applies "only to particular types of elements." *State v. Simonov*, 358 Or 531, 539, 368 P3d 11 (2016). Criminal liability generally requires an accompanying mental state for each element. *State v. Rutley*, 343 Or 368, 373, 171 P3d 361 (2007). Elements are divided into types—conduct, result, or circumstance. Circumstance elements, as we explained in *Simonov,* require only recklessness or criminal negligence. *Simonov*, 358 Or at 539-40.

For ORS 163.165(1)(c), "physical injury" is a result element. Causing, "by means of a deadly of dangerous weapon" is a conduct element in the statute—the conduct is the use of the weapon. "Under circumstances manifesting extreme indifference" is a circumstance element of the statute. We know that "under circumstances manifesting extreme indifference" is a circumstance element because that is *what the statute says*. Surely, we cannot expect the legislature to speak any clearer than explicitly using the terms "under circumstances" in the text of a criminal statute to denote a circumstance element. Accordingly, recklessness is the mental state applicable to all three elements of ORS 163.165(1)(c). As such, the state need only plead and prove that the defendant was reckless in causing injury, reckless in the use of the weapon, and reckless as to the existence of the circumstance. The state does not need to prove that a defendant was *extra* reckless. Acting in a generally reckless manner, while recklessly disregarding that circumstances exist such that reckless conduct committed under those circumstances could endanger lives, is sufficient.

However, the majority interprets "under circumstances" in ORS 163.165(1)(c) as a form of heightened recklessness, and thus, not as a circumstance element, but as a conduct element. *See, e.g.*, 372 Or at 731 (stating that the legislature understood "'extreme indifference' \*\*\* to apply to only the most serious forms of life-endangering *conduct*" (emphasis added)). In short, the majority rewrites

the statute—rather than conduct occurring under circumstances manifesting extreme indifference, the majority says that the conduct itself must manifest extreme indifference. Under that reasoning, the "circumstance" cannot be external to the reckless act, defendant must be the cause, through his conduct, of the circumstance that manifests extreme indifference. Through that rewriting of the statute, the majority comes to its ultimate conclusion that,

> "[i]n the context of firearms, the legislature associated 'extreme indifference' with *conduct* such as shooting a firearm in the direction and range of other people or, at least, as relevant here, *conduct* that materially increases the risk of an accidental discharge in the direction and range of others beyond the risk inherent in handling and displaying a loaded gun."

*Id*. at 731-32.

Treating extreme indifference as conduct, as opposed to a circumstance, carries consequences. A few examples illustrate the problem. Shooting a firearm into the air is inherently reckless conduct; because of gravity, the bullet will eventually return to earth, where it could strike another person. Shooting a firearm into the air in a secluded location is still reckless conduct, but those circumstances would not manifest "extreme indifference to the value of human life" even if, upon returning to earth, the bullet struck a person who, unbeknownst to the shooter, happened to be hiking in the nearby woods. But engaging in the exact same reckless conduct—shooting a firearm into the air—in the middle of a densely packed urban area might well be considered conduct under "circumstances manifesting extreme indifference to the value of human life."

Or consider an example closer to the facts of this case. Holding a loaded weapon out for display, and showing it to friends, and having it discharge, may be reckless, but when done in a private setting in one's home may not be done under circumstances manifesting extreme indifference to the value of human life. However, doing those exact same actions on a crowded dance floor surrounded by dozens of closely packed people, could be reckless conduct engaged in under circumstances manifesting extreme indifference.

Each of those examples illustrates a circumstance that is external to defendant's conduct. Defendant's conduct does not cause the circumstance—the urban setting, or the dance floor. In each, defendant's conduct is the same—firing the weapon, intentionally or recklessly. But, when defendant's conduct is committed under those external circumstances, the moral blameworthiness changes. The majority's conflation of conduct and circumstance limits the potential universe of increased moral fault only to those circumstances that defendant had a hand in bringing about.

To reach that result, the majority relies heavily on *State v. Boone*, 294 Or 630, 661 P2d 917 (1983). There, the defendant had been convicted of several crimes, including second-degree assault, after he drove his automobile across the center line while he was intoxicated, crashing into another vehicle and seriously injuring its occupants. Under the governing statute, a person could commit second-degree assault by "recklessly caus[ing] serious physical injury to another by means of a deadly or dangerous weapon under circumstances manifesting extreme indifference to the value of human life." *Id*. at 632 (quoting ORS 163.175(1)(c) (1977), *amended by* Or Laws 2005, ch 22, § 110).

In that case, we noted, in a footnote, that "[i]t is not the 'circumstances' that manifest extreme indifference but rather it is the conduct of a defendant that manifests his or her extreme indifference." *Id*. at 634 n 8. However, that statement cannot be read in isolation. Critically, the sentence immediately following states that "[w]hether a defendant's conduct manifests extreme indifference must be determined from all the circumstances surrounding the conduct." *Id*. at 634 n 8. And we returned to the text of the statute in articulating the holding in *Boone*: "We hold that *the circumstances which exist in this case* suffice to establish defendant's extreme indifference to the value of human life." *Id*. at 639-40 (emphasis added). Thus, unlike the majority, *Boone* itself appears to accept that the circumstances that manifest extreme indifference can be entirely independent from defendant, and while they may contextualize defendant's conduct, they need not be *caused* by defendant's conduct.

But, to whatever extent *Boone* must be read to compel the majority's transformation of extreme indifference from a circumstance element to a conduct element, the footnote in *Boone* is clearly wrong and we should disavow it.[1] Although I readily agree that statutory interpretation involves more than mere textualism, plain text must be meaningfully grappled with because "there is no more persuasive evidence" of the legislature's intent than the words used in the statute, because "[o]nly the text of the statute receives the consideration and approval of a majority of the members of the legislature[.]" *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009). We are not free to ignore the text of a statute if we think that the text "does not accurately state" what the legislature intended. *Boone*, 294 Or at 634 n 8. If we did that, "we would be rewriting a clear statute based solely on our conjecture that the legislature could not have intended a particular result." *State v. Vasquez-Rubio*, 323 Or 275, 283, 917 P2d 494 (1996).

I cannot reconcile the majority's interpretation with the clear and unambiguous language chosen by the legislature. Nor do I view the legislative history here as compelling the majority's interpretation. It is true that the legislature discussed examples of a person planting a bomb or intentionally firing across a highway in a commercial area or shooting into a crowd. But the mere fact that the legislature only used the most extreme hypotheticals does not foreclose that they intended to capture less extreme scenarios as evidenced by the language they actually enacted into law. There is no legislative history on this record that shows that the legislature intended to foreclose unintentional firearm discharge from coming under the ambit of the statute. As Justice Bushong recently noted, the legislature can, and often does, enact language broader that the scenarios brought before it to urge enactment of a law. *State v. Azar*, 372 Or 163, 187-88, 547 P3d 788 (2024) (Bushong, J., dissenting) ("That commonly occurs during the legislative

---

[1] Because we would be disavowing the footnote in *Boone*, not the holding of that case, the doctrine of *stare decisis* presents no obstacle. *See State v. Owen*, 369 Or 288, 302, 505 P3d 953 (2022) (stating that, under the doctrine of *stare decisis*, a party seeking to persuade us to abandon precedent must identify, in addition to a deficit in the analytical process employed in the prior case, that "that holding in [the prior case] is incorrect" and that abandoning that holding "is now prudent").

process. *See, e.g.*, *State v. Nascimento*, 360 Or 28, 44, 379 P3d 484 (2016) (recognizing that the legislature '"may and often does choose broader language that applies to a wider range of circumstances than the precise problem that triggered legislative attention"' (quoting *South Beach Marina, Inc. v. Dept. of Rev.*, 301 Or 524, 531, 724 P2d 788 (1986))); *Hamilton v. Paynter*, 342 Or 48, 55, 149 P3d 131 (2006) ('[T]he statutory text shows that, even if the legislature had a particular problem in mind, it chose to use a broader solution.').)." (Brackets in *Azar.*)).

Turning now from statutory interpretation to record sufficiency, for the majority, there must be some evidence of "*conduct* that materially increases the risk of an accidental discharge in the direction and range of others beyond the risk inherent in handling and displaying a loaded gun." 372 Or at 731-32. Even if I were to accept the majority's reading of the statute—that extreme indifference is not a circumstance, but rather a form of conduct akin to a heightened level of recklessness—viewed in the light most favorable to the state, there would still be ample evidence to create a question of fact as to extreme indifference.

Defendant is a convicted felon who cannot lawfully possess a firearm. That circumstance was particularly important to the trial court, and permissibly so. As we have said, part of the "extreme indifference" element "contemplates circumstances which make defendant more blameworthy than recklessness." *Boone*, 294 Or at 635. Those circumstances include the subjective characteristics of the defendant. In the context of vehicular homicide, we considered the level of defendant's intoxication. *Id*. For example, in *Boone*, we noted that the defendant "was also found guilty of driving while suspended. Were he driving with knowledge of suspension, that fact would be another indication of an indifferent state of mind, for it reflects a lack of concern for social and legal responsibility." *Id*. at 640 n 15. Perhaps felon status, on its own, is not sufficient to send the issue of extreme indifference to the jury—a point I need not decide. But defendant's felon status is, at least in part, properly considered as one component of the factual circumstances that can, collectively, establish extreme indifference.

Defendant's status as a felon is important because Oregon law provides that those who have broken our most serious laws—felonies—are presumptively a greater risk to the public than law abiding citizens. Accordingly, ORS 166.270(1) provides:

"Any person who has been convicted of a felony under the law of this state or any other state, or who has been convicted of a felony under the laws of the Government of the United States, who owns or has in the person's possession or under the person's custody or control any firearm commits the crime of felon in possession of a firearm."

For a felon to restore their firearm rights, that individual must affirmatively persuade a court, "by clear and convincing evidence," that the presumption that "the petitioner does not pose a threat to the safety of the public." ORS 166.274(7).

The reason for defendant's firearm prohibition is also relevant. Oregon classifies felon in possession differently depending on the severity of the underlying offense. For a single felony, felon in possession is a misdemeanor. *See* ORS 166.270(4)(a). However, if that underlying felony itself involves the use of a deadly or dangerous weapon, then felon in possession of a firearm is classified by the legislature as a more serious public safety concern and is a Class C felony.

Here, defendant's possession of the handgun was the most serious—a Class C felony because of defendant's criminal record. The court admitted state's exhibit 3, which showed that defendant was a felon because defendant had pleaded guilty to assault in the second degree, ORS 163.175, in Marion County Case Number 07C48829, in return for the dismissal of an attempted murder charge. ORS 163.175 provides, in relevant part:

"A person commits the crime of assault in the second degree if the person:

"* * * * *

"(b)   Intentionally or knowingly causes physical injury to another by means of a deadly or dangerous weapon; or

"(c)  Recklessly causes serious physical injury to another by means of a deadly or dangerous weapon under

circumstances manifesting extreme indifference to the value of human life."

Accordingly, this record shows that defendant was not unfamiliar with the dangers posed by weapons, because he had injured someone with a weapon in the past sufficient to justify a conviction for assault in the second degree, and a mandatory minimum sentence of 70 months in prison. As a result, the legislature determined that defendant fell within a category of individuals who posed the *most extreme* public safety risk, sufficient to warrant felony charges simply for possession of a firearm.

Despite that background, and in intentional violation of the law that prohibited him from possessing a weapon, defendant nevertheless acquired a handgun. Defendant did not have just a loaded firearm. He had a live round racked in the chamber. Defendant tucked that handgun into his waistband, not a holster, and went into a crowded bar. The bar in question was small. It was filled with over thirty patrons crowded into a small space. As defendant sat in the bar that night, defendant was committing a Class C felony simply by virtue of his possession of the firearm in his waistband, because the Oregon legislature has deemed him, by virtue of his felony status, as a greater risk to public safety with firearms than others.

Defendant sat at a table with two other men, and from the two empty pitchers and three empty cups visible on their table in the surveillance video, a factfinder could reasonably infer that the group had consumed alcohol by the time of the incident. Shortly before defendant removed the firearm from his waistband, he can be seen in surveillance video pantomiming the racking and firing a handgun. As the prosecutor described:

> "When Your Honor watches *** [d]efendant's hands as he's talking, Your Honor should notice a couple of things. *** Defendant is gesturing. When he's gesturing, he's pointing with a single finger, he's pointing certain ways. But then at some point during the conversation that happened about a couple of seconds there, he points his hands, two fingers together, extended just like a gun at the gentleman in the

black hoodie. He then puts his hand up in the air, racks the slide.

"\* \* \* \* \*

"But Your Honor, should watch what's on the screen. This is not a [d]efendant who is sitting there having a casual conversation about flowers in the field or two people at the bar. This is a [d]efendant who's describing a shooting. Immediately after describing the shooting, instead of moving on safely, he pulls a firearm out of his waistband in a crowded bar."

After that pantomime, defendant took his illegal firearm from his waistband and showed it to the people sitting at his table, holding it by the handle, his finger on, or near, the trigger (the video is not clear). Defendant did not clear the chamber, remove the clip, open the action, or ensure that the weapon safety was engaged or operational. Given the crowd present in such a confined space, in the act of showing the illegal firearm defendant inevitably pointed it in the direction of as many as eight to nine patrons. There are established rules of safety universally agreed upon by responsible Oregon gun owners: Treat all firearms as if they were loaded, keep firearms pointed in a safe direction, keep your finger away from the trigger area unless you intend to fire the weapon, be situationally aware of your potential target and what is behind. Defendant did not just forget some of those rules—he disregarded *all of them*. Placing the weapon back into his waistband, not a holster, defendant pulled the trigger. Both defendant and another person at his table were shot and injured. But for the smallest of changes—a centimeter of angle difference, a slight shift in the placement of a table or chair—the shot could have been fatal to any number of people in the bar.

To be clear, I agree that an injury caused by the reckless discharge of a firearm, without more, would be insufficient to establish circumstances manifesting extreme indifference to the value of human life. But there is much more on this record—defendant's status as a felon and his unlawful possession of the firearm to begin with, his gestures prior to the incident, the small space, the number of people, the presence of alcohol, the chambered round, the

failure to engage the safety, and the pointing of the handgun in the direction of not just one, but multiple people. This goes "beyond the risk inherent in handling and displaying a loaded gun," which the majority itself requires.

Like the grant of summary judgment in civil proceedings, the grant of a motion for judgment of acquittal on record sufficiency is a drastic measure. Removing a matter from the factfinder because of the court's perception of the strength of the record should be approached with caution, for it is the factfinder, not the court, who is the preferred entity to render "[t]he community's judgment [as to] whether the defendant's conduct met that threshold in the factual circumstances of any particular case." *Chapman v. Mayfield*, 358 Or 196, 206, 361 P3d 566 (2015); *see also Piazza v. Kellim*, 360 Or 58, 74, 377 P3d 492 (2016) (holding the same). It accordingly requires an exceedingly high standard, that the court view "the evidence in the light most favorable to the state" and then determine that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Walton*, 311 Or 223, 241, 809 P2d 81 (1991). That principle is especially applicable when a statute requires an assessment of a defendant's conduct under the circumstances presented. *See State v. Cunningham*, 320 Or 47, 61, 880 P2d 431 (1994) (acknowledging that "the assessment of circumstances surrounding a defendant's conduct usually should be left to the jury").

In this case, could a rational factfinder conclude that the evidence here was insufficient to prove beyond a reasonable doubt that the circumstances manifested an extreme indifference to human life? Most certainly. But, in the light most favorable to the prosecution, I am unable to conclude the reverse: that any factfinder who viewed these facts and then concluded that defendant did act in a manner that manifested extreme indifference to the value of human life, would be *irrational* as a matter of law.[2] What ultimate

---

[2] In refusing to let these facts go to a jury, the majority sets up a conundrum. Defendant's mere possession of the handgun was a Class C felony. And yet, on the facts of this case, defendant's act of drawing the handgun, not merely possessing it, then recklessly discharging the handgun in a crowded bar, injuring both himself and another person, and risking the potential death of multiple people, as a matter of law, failed to create a jury question on the issue of extreme indifference, and accordingly, as a matter of law, constituted no more than possibly a violation

verdict we might render is not the issue. The question here is whether this record is so lacking that the law required the court to deprive the factfinder of its role to render the "community's judgment." *Chapman*, 358 Or at 206. It was not.

I respectfully dissent.

Bushong, J., joins in this dissenting opinion.

---

of ORS 163.160, assault in the fourth degree, a misdemeanor. Further, under the majority's reasoning, that paradoxical disparity between the misdemeanor discharge of the firearm and resulting injury, in contrast to the felonious mere possession, was intended by the legislature.