No. 9 April 3, 2025 307

IN THE SUPREME COURT OF THE
STATE OF OREGON

Steven BELLSHAW,
individually and
on behalf of
all other similarly situated persons,
*Respondent on Review,*

*v.*

FARMERS INSURANCE COMPANY OF OREGON,
an Oregon corporation,
*Petitioner on Review.*

(CC 15CV16877) (CA A173722) (SC S070423)

On review from the Court of Appeals.*

Argued and submitted March 14, 2024.

Nadia Dahab, Sugerman Dahab, Portland, argued the cause and filed the briefs for respondent on review. Also on the briefs were David F. Sugerman, Sugerman Dahab, Portland, and Tim Quenelle, Tim Quenelle PC, Lake Oswego, Oregon.

Brad S. Daniels, Stoel Rives LLP, Portland, argued the cause and filed the briefs for petitioner on review. Also on the briefs were Timothy W. Snider and Stephen H. Galloway.

Elizabeth C. Savage, Elizabeth Savage Law, P.C., Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Before Flynn, Chief Justice, and Duncan, Garrett, DeHoog, James, and Masih, Justices, and Walters, Senior Judge, Justice pro tempore.**

––––––––––––––

* Appeal from Multnomah County Circuit Court, Judith H. Matarazzo, Judge. 326 Or App 605, 533 P3d 40 (2023).

** Bushong, J., did not participate in the consideration or decision of this case.

GARRETT, J.

The decision of the Court of Appeals is reversed in part. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

James, J., dissented and filed an opinion, in which Masih, J., joined.

**GARRETT, J.**

Under Oregon law, motor vehicle insurers must provide their insureds with a notice stating certain information in "clear and conspicuous language approved by the director" of the Department of Consumer and Business Services (DCBS). ORS 746.290(2). In this case, plaintiff alleges that defendant Farmers Insurance Company of Oregon issued a notice that omitted some of the required information. Farmers contends that it satisfied its statutory obligation by using language approved by the director of DCBS, regardless of whether the language approved by the director includes all the information described in the statute. Plaintiff interprets ORS 746.290(2) to impose an independent and absolute obligation on an insurer to provide a notice with certain information and contends that Farmers' notice was insufficient notwithstanding the director's approval.

The trial court agreed with plaintiff's interpretation of the statute and granted plaintiff's motion for summary judgment. The Court of Appeals upheld that ruling. We allowed review and now reverse. As we will explain, in requiring that insurers use wording "approved by the director" to comply with their notice obligation under ORS 746.290(2), the legislature intended that insurers would be able to rely on the director's approval to ensure that they were in compliance with the statute. Accordingly, regarding the content of the notice, an insurer satisfies its obligation under ORS 746.290(2) if, and only if, the insurer uses language approved by the director. Whether the language approved by the director omits some of the information described in the statute is immaterial to the insurer's liability. In this case, the trial court interpreted the statute in the opposite manner, determining that Farmers had violated ORS 746.290(2) because the notice omitted required information and holding that the director's approval was immaterial to Farmers' liability. The trial court erred in granting summary judgment to plaintiff on that basis.

## I. BACKGROUND

The trial court resolved this case on cross-motions for summary judgment, granting plaintiff's motion and

denying Farmers' motion. Although we review the summary judgment record in a light most favorable to the nonmoving party, the parties have not identified any material factual disputes that bear on the narrow question of statutory interpretation that we resolve. *Brown v. GlaxoSmithKline, LLC*, 372 Or 225, 227, 548 P3d 817 (2024).

The statutory scheme at issue is Oregon's "choice-of-shop" law, which prohibits motor vehicle insurers from requiring that insureds use particular repair shops as a condition of recovering under a policy. ORS 746.280. The law also imposes notice requirements on insurers and repair shops. ORS 746.285; ORS 746.290. The notice requirement at issue in this case is found in ORS 746.290(2). That provision requires insurers, at the time of issuing a motor vehicle policy, to provide a "statement in clear and conspicuous language approved by the director of: (a) The rights and responsibilities of the insured when a claim is submitted; and (b) The provisions of ORS 746.280."[1] ORS 746.290(2).

---

[1]  The notice provision in ORS 746.290(2) requires the use of language approved by "the director," but it does not indicate which "director." The history of the statute makes clear that it is referring to the director of DCBS. *See Oregon Revised Statutes*, Preface, xx-xxi, xxiv (2023) (describing relevant editorial changes made by Legislative Counsel pursuant to statutory authorization).

When that notice provision was originally enacted, in 1977, it required the use of language "approved by the *commissioner*," rather than "approved by the director." Or Laws 1977, ch 785, § 4(2), *codified as* ORS 746.290(2) (1977) (emphasis added). The "commissioner" referred to the state Insurance Commissioner, who, at the time, led the Insurance Division within the Department of Commerce. *See* ORS 731.208 (1977) (describing the Insurance Commissioner as the head of the Insurance Division).

In 1987, the legislature abolished the Insurance Division and created the Department of Insurance and Finance as its successor. Or Law 1987, ch 373, § 3(1) - (3). The legislature provided that statutory references to the Insurance Commissioner "shall be considered as referring to or describing" the Director of the Department of Insurance and Finance. Or Law 1987, ch 373, § 15(1). The legislature also authorized Legislative Counsel to modify the ORS by replacing statutory references to the Insurance Commissioner with references to the Director of the Department of Insurance and Finance. Or Law 1987, ch 373, § 15(1), (2)(b). The ORS first reflected that change in 1987. *See* ORS 746.290(2) (1987) (requiring the notice to contain "clear and conspicuous language approved by the *director*" (emphasis added)).

The legislature did the same thing in 1993 when it abolished the Department of Insurance and Finance and created the DCBS as its successor. Or Laws 1993, ch 744, §§ 1, 32-33. Statutory references to the Director of the Department of Insurance and Finance were deemed to be references to the Director of DCBS. Or Laws 1993, ch 744, § 35(3). And the legislature authorized Legislative Counsel to modify the ORS by replacing statutory references to the Director of the Department of Insurance and Finance with references to the Director of DCBS. Or Laws 1993, ch 744, § 35(5).

An insured may bring a private cause of action against an insurer for violating the notice provision set out in ORS 746.290(2). ORS 746.300. An insurer that violates that notice provision may be subject "to actual damages or $100, whichever is greater, for each violation." *Id.*

Plaintiff purchased motor vehicle insurance from Farmers in 2011. Upon issuing the policy, Farmers included a notice that, according to plaintiff, failed to refer to all parts of ORS 746.280. Plaintiff filed a class action alleging that Farmers had violated the notice provision in ORS 746.290(2)(b) because the notice that Farmers had provided to him and other Oregon insureds failed to fully state "the provisions of ORS 746.280." ORS 746.290(2)(b).

The history of the "choice-of-shop" law provides context for understanding the nature of plaintiff's claim. In 1977, the legislature enacted both the notice provision in dispute, ORS 746.290(2)(b), and the statute cross-referenced in the notice provision, ORS 746.280. At the time, ORS 746.280 consisted of only one paragraph:

> "An insurer shall not require that a particular person make the repairs to the insured's motor vehicle as a condition for recovery by the insured under a motor vehicle liability insurance policy."

Or Laws 1977, ch 785, § 2, *codified as* ORS 746.280 (1977).

Although, following those 1977 enactments, insurers were required to issue notices stating the provisions of ORS 746.280 in language approved by the DCBS director's predecessor, there is no record of what language the director's predecessor approved between 1977 and 1993. In 1993, the director's predecessor issued a bulletin approving specific language for insurers to use in the notices required by ORS 746.290(2). Oregon Insurance Division Bulletin 93-3, 1993 WL 13563876 (Apr 20, 1993). The bulletin approved language intended to describe "the rights and responsibilities of the insured when a claim is submitted" and "describe the provisions of ORS 746.280." As to the provisions of ORS 746.280, the bulletin repeated the statutory text:

> "We have approved the following language for the [notice]:

"*****

"Oregon law states:

"An insurer shall not require that a particular person make the repairs to the insured's motor vehicle as a condition for recovery by the insured under a motor vehicle liability insurance policy."

*Id.* at \*1. The bulletin explained, "If you [an insurer] choose to use this language, it is not necessary to submit notice for the director's approval." *Id.* In 1994, Farmers began using language tracking the 1993 bulletin in the notices that it sent to all its insureds in Oregon.

In 2007, the legislature amended ORS 746.280 to add additional requirements. The statute retained the existing wording but moved it to a new subsection (1). Or Laws 2007, ch 506, § 1(1), *codified as* ORS 746.280(1). It was followed by three new subsections that require an insurance adjuster to provide disclosures to an insured before recommending a particular repair shop; prohibit an insurer from limiting recovery for repairs based on an insured's decision not to use a recommended shop; and require an insurer to provide disclosures to an insured if the insured accepts the insurer's repair shop recommendation. Or Laws 2007, ch 506, § 1(2) - (4), *codified as* ORS 746.280(2) - (4).[2] Although

---

[2] As amended, ORS 746.280 provides:

"(1)  An insurer may not require that a particular person make the repairs to the insured's motor vehicle as a condition for recovery by the insured under a motor vehicle liability insurance policy.

"(2) Prior to providing a recommendation that a particular person make repairs to the insured's motor vehicle, the person adjusting the claim on behalf of the insurer shall inform the insured of the rights conferred by subsection (1) of this section by communicating in a statement substantially similar to the following:

"OREGON LAW PROHIBITS US FROM REQUIRING YOU TO GET REPAIRS TO YOUR VEHICLE AT A PARTICULAR MOTOR VEHICLE REPAIR SHOP. YOU HAVE THE RIGHT TO SELECT THE MOTOR VEHICLE REPAIR SHOP OF YOUR CHOICE.

"(3) If an insured elects to have the motor vehicle repaired at a motor vehicle repair shop other than a shop recommended by the insurer, the insurer may not limit the cost of repairs necessary to return the motor vehicle to a preloss condition relative to safety, function and appearance other than as stated in the policy or as otherwise allowed by law.

"(4) If an insured accepts the insurer's recommendation, the insurer shall provide, electronically or in printed form, a statement to the insured

the legislature amended ORS 746.280 at that time, the legislature made no corresponding change to the notice provision, ORS 746.290(2)(b), which continued to require that the notice state "the provisions of ORS 746.280."

The legislature has not amended ORS 746.280 since 2007. Following the 2007 amendments to ORS 746.280, DCBS did not issue guidance approving new language for insurers to use in the notices that accompany their motor vehicle policies.

The notice that Farmers provided to plaintiff in 2011 used the same language that Farmers had been using since 1994, tracking the language from the 1993 bulletin. So, as it related to the provisions of ORS 746.280, the notice repeated the single original paragraph of that statute as enacted in 1977, which is now contained in ORS 746.280(1). But Farmers' notice did not repeat or otherwise expressly address the new subsections that the legislature added in 2007 and that are contained in ORS 746.280(2) to (4). The notice that Farmers provided to plaintiff stated:

> "AN INSURER SHALL NOT REQUIRE THAT A PARTICULAR PERSON MAKE THE REPAIRS TO THE INSURED'S MOTOR VEHICLE AS A CONDITION FOR RECOVERY BY THE INSURED UNDER A MOTOR VEHICLE LIABILITY INSURANCE POLICY."

(Uppercase in original.)

In his complaint on behalf of a class of Farmers' insureds, plaintiff alleged that, because Farmers' notice included only subsection (1) of ORS 746.280 and did not quote or address subsections (2) to (4), Farmers' notice failed to include a "statement" of "[t]he provisions of ORS 746.280," as required by the notice provision in ORS 746.290(2)(b). Plaintiff alleged that Farmers had violated ORS 746.290(2)(b)

---

within three business days after the date of acceptance in substantially the following form:

> "WE HAVE RECOMMENDED A MOTOR VEHICLE REPAIR SHOP. IF YOU AGREE TO USE OUR RECOMMENDED REPAIR SHOP, YOUR VEHICLE WILL RECEIVE REPAIRS RETURNING IT TO A PRELOSS CONDITION RELATIVE TO SAFETY, FUNCTION AND APPEARANCE AT NO ADDITIONAL COST TO YOU OTHER THAN AS STATED IN THE INSURANCE POLICY OR AS OTHERWISE ALLOWED BY LAW."

(Uppercase in original.)

by failing to sufficiently state the provisions of ORS 746.280; plaintiff did not allege that Farmers violated ORS 746.290(2)(b) by failing to use language approved by the director.

Following discovery, plaintiff and Farmers filed cross-motions for summary judgment. According to plaintiff's motion, the fact that Farmers' notice had failed to state all "[t]he provisions of ORS 746.280" entitled him and the other class members to statutory damages under ORS 746.300. Farmers argued that it had satisfied ORS 746.290(2)(b) because it had used language "approved by the director," regardless of whether the director-approved language included all the information that plaintiff alleged it should have. Farmers further argued, in the alternative, that its notice did include all the statutorily required information. According to Farmers, only subsection (1) of ORS 746.280 was required to appear in the notice because subsections (2) to (4) merely repeated the right to choose a repair shop already described in subsection (1). And Farmers maintained that, when the legislature added subsections (2) to (4) in 2007, it did not add new requirements to the notice that accompanies the issuance of the policy. Instead, Farmers argued that the notices required by subsections (2) to (4) apply only during the claim adjustment process, after an insured has filed a claim for repairs and an adjuster recommends, or already has recommended, a repair shop to the insured.

The trial court agreed with plaintiff, concluding that, regardless of whether Farmers had used language approved by the director, Farmers had an independent obligation to provide a statement of "[t]he provisions of ORS 746.280" and that Farmers had failed to satisfy that obligation because its notice described only one of the four subsections in ORS 746.280. On that basis, the trial court granted plaintiff's motion for summary judgment and denied Farmers' motion for summary judgment. The trial court imposed the statutory penalty of $100 for each insured in the plaintiff class, resulting in a judgment against Farmers in the amount of $26,319,200.

Farmers sought appellate review, challenging numerous decisions by the trial court, including the decisions

to grant plaintiff's motion for summary judgment and to deny Farmers' motion for summary judgment. As to those decisions, the Court of Appeals rejected Farmers' arguments. That court first rejected Farmers' argument that an insurer satisfies the notice requirement in ORS 746.290(2)(b) by providing a notice that uses language approved by the director. The court reasoned that, although the notice provision requires insurers to use language "approved by the director," the notice provision "does not delegate authority to the director to determine what is necessary to comply with the statute." *Bellshaw v. Farmers Ins. Co.*, 326 Or App 605, 613, 533 P3d 40 (2023). The court further held that, because Farmers' notice "did not contain information regarding all four sections of ORS 746.280," the notice was deficient and the trial court had, therefore, properly granted summary judgment to plaintiff. *Id.* at 617.[3]

Farmers petitioned this court for review, which we allowed.

## II. ANALYSIS

On review, Farmers reprises its arguments to the trial court and the Court of Appeals. First, Farmers contends that the notice provision in ORS 746.290(2) requires an insurer to use language "approved by the director" but imposes no independent obligation on the insurer to ensure that the director-approved language includes any particular content. Second, Farmers contends in the alternative that, if an insurer does have an independent obligation to ensure that the notice includes particular content, then its notice was sufficient. Plaintiff disputes both arguments.

We begin with the first of those two arguments because that argument determines the scope of the obligation imposed on the insurer. That is, if we agree with Farmers that an insurer satisfies the content requirement for the notice described in ORS 746.290(2) if, and only if, the insurer uses language approved by the director, then an insurer's liability for violating that requirement turns solely on that approval. An insurer that uses language approved

---

[3] The Court of Appeals decision also addressed questions related to the class definition, the statute of limitations, and due process limits on the damage award. *Id.* at 617-30. Those issues are not before this court on review.

by the director is not subject to liability, while an insurer that does not use such language *is* subject to liability. Under that interpretation, whether the notice sufficiently states the provisions of ORS 746.280 in the opinion of a third party or a reviewing court would be immaterial to the insurer's liability and would be outside the scope of a private cause of action against the insurer.

Before attempting to resolve the parties' dispute on that issue, it is important to define the issue more clearly. At times, plaintiff frames the question as *who* decides whether an insurer has complied with the notice provision. Plaintiff appears to characterize Farmers as taking the position that the statute delegates to the director the authority to determine whether an insurer's notice is adequate; according to plaintiff, courts must assess whether the insurer's notice sufficiently states the provisions of ORS 746.280, without deference to the director's interpretation of the notice provision. That framing is also reflected in the Court of Appeals decision. As noted, the Court of Appeals held that the legislature did "not delegate authority to the director to determine what is necessary to comply with the statute." *Bellshaw*, 326 Or App at 613. Based on that reasoning, the Court of Appeals held that the director's approval of an insurer's notice language does not determine whether the content of a notice actually satisfies an insurer's obligation under the notice provision.

But the issue before us is not one of delegation; the question is not who decides whether an insurer's notice has complied with the statutory obligation. Instead, the interpretive question is what obligation the notice provision imposes on an insurer in the first place. That is, Farmers is not arguing that the director, rather than a court, decides whether an insurer has satisfied its obligation to provide the required notice. Instead, Farmers argues that, under the correct interpretation of ORS 746.290(2), an insurer's only obligation regarding the content of a notice is to use language "approved by the director."

Stated another way, the parties' dispute turns on how we define the elements of plaintiff's claim against Farmers. Under ORS 746.300, an insured may bring a

private cause of action against an insurer if the insurer "violates" ORS 746.290. An insurer violates ORS 746.290 by failing to satisfy the obligations that ORS 746.290 imposes *on an insurer*. Therefore, the issue before us is determining what obligations ORS 746.290 imposes on an insurer.

Defining the elements of a statutory cause of action presents a question of statutory interpretation. *See Moody v. Oregon Community Credit Union*, 371 Or 772, 791, 542 P3d 24 (2023) ("When the legislature intends to impose liability for violation of a statute, the elements of that statutory claim are determined by the legislature[.]"). We review questions of statutory interpretation for errors of law, seeking to give effect to the intent of the legislature as demonstrated by the text in context and any helpful legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

We begin with the text of ORS 746.290(2):

"(2) Every motor vehicle liability insurance policy issued in this state after December 31, 1977, and any extension or renewal after that date of a policy issued before that date shall be accompanied by a statement in clear and conspicuous language approved by the director of:

"(a) The rights and responsibilities of the insured when a claim is submitted; and

"(b) The provisions of ORS 746.280."

Thus, ORS 746.290(2)(b) requires an insurer to state the provisions of ORS 746.280 using clear and conspicuous language approved by the director.

While that general directive is clear, the details remain in dispute. Plaintiff contends that the text is susceptible to only one interpretation: that an insurer's notice violates ORS 746.290(2) if an insurer fails to issue a notice that recites each and every word of ORS 746.280, regardless of whether the director has approved the notice language. But the text is not a model of legislative drafting and does not, on its face, compel only one interpretation. Although plaintiff's view that "a statement" of "[t]he provisions of ORS 746.280" must recite each provision verbatim is plausible, the fact that the notice provision requires that the statement be in "clear" language "approved by the director" suggests

a plausible alternative: the legislature intended the director to play a role in determining the content of the notice so that it is written in plain and understandable language accessible to ordinary consumers.[4]

As to the scope of an insurer's obligation, the text of the notice provision is ambiguous because it fails to clearly identify who is required to do what. The subject of the provision is the insurance policy, rather than a person or entity, and the act required by the provision is in the passive voice. *See* ORS 746.290(2) ("Every motor vehicle liability insurance policy * * * shall be accompanied by a statement * * *."). That complicates the task before this court, which is determining the scope of an insurer's obligation under the provision. The provision, for example, never expressly refers to an insurer. One is left to infer that, because insurance policies are issued by insurers, the obligation to accompany a policy with the required notice is an obligation belonging to insurers.

Although the parties agree that the provision requires insurers to make sure that policies are accompanied by a notice, the parties dispute the scope of the insurer's obligation in determining the content of that notice. The provision's failure to identify who is required to do what poses a textual problem in resolving that dispute. The provision imposes two requirements regarding the content of the notice: (1) the language must be approved by the director; and (2) the language must clearly and conspicuously state certain information—the rights and responsibilities of the insured when a claim is submitted and the provisions of ORS 746.280. The question is whether those requirements should be interpreted as obligations imposed on the insurer, the director, or both.

Based on the text of the notice provision, the requirement that the language be approved by the director is an obligation imposed on the insurer. It would be incoherent

---

[4] We also observe that, since its adoption in 1977, ORS 746.290(2)(b) has referred to "[t]he *provisions* of ORS 746.280." Or Laws 1977, ch 785, § 4(2)(b) (emphasis added). Despite the reference to the plural "provisions," ORS 746.280 consisted of only one paragraph from 1977 to 2007, when the legislature added three additional paragraphs. Or Laws 1977, ch 785, § 2. As a result, it is unclear what weight, if any, to place the legislature's use of the plural "provisions."

to require the director to obtain the director's approval. As a result, the text suggests that an insurer cannot satisfy the notice provision unless the insurer uses language in the notice that has been approved by the director.

Determining who is obligated to ensure that the language clearly and conspicuously states the necessary information, including the provisions of ORS 746.280, is more difficult to resolve. Farmers interprets that requirement as being addressed to the director and describing the notice language that the director should approve. Plaintiff interprets that requirement as imposing a second obligation on the insurer, so that the insurer is required to *both* obtain the director's approval on the notice language *and* ensure that the language clearly and conspicuously states the necessary information, including the provisions of ORS 746.280.

As noted above, both interpretations are plausible on the face of the statute. The text can reasonably be read to support Farmers' interpretation. On that view, the phrase "approved by the director" would essentially modify the remainder of the obligation imposed by the statute, so that the director's approval would be determinative of whether the wording in a notice is legally sufficient. Similarly, plaintiff's view that a notice under ORS 746.290 must use language approved by the director *and*, as an independent requirement, clearly and conspicuously state each provision of ORS 746.280 is textually plausible. Neither party identifies any additional context that would help resolve the textual ambiguity.

The legislative history, however, directly addresses the separate obligations of the insurer and director in determining the content of the notice and persuades us that the legislature intended Farmers' interpretation. The salient legislative history focuses on the legislature's decision to add the words "approved by the director"—or, as it was originally adopted, "approved by the commissioner," which referred to the state Insurance Commissioner, the position that preceded the DCBS director.

The notice provision that appears in ORS 746.290(2) was drafted during hearings before the House Judiciary

Committee in 1977. The committee first considered a version of the notice provision that did not include the words "approved by the commissioner" but that otherwise tracked the current version of ORS 746.290(2). That original version of the notice provision would have required insurers to provide insureds with a clear statement of their rights and responsibilities when a claim is submitted as well as the provisions of what was later codified as ORS 746.280.

Later in the hearing, Tom Fender, a witness representing auto body repair shops, suggested adding the words "approved by the commissioner." According to Fender, some insurers had expressed concern about the uncertain scope of the required notice in the draft bill. As Fender described that concern, the insurers feared that without clear statutory direction on the content required to be in the notice, insurers would have no certainty before issuing the new notices that the notices complied with the statute. Requiring that the notice be approved by the commissioner would provide the insurers with certainty that they could avoid liability so long as they used language that the commissioner had approved:

> "Fender: Mr. Chairman, the—the other suggestion we had in that Subsection 2 of Section 5 [codified as ORS 746.290], is that after the word 'statement' in the last line, there be inserted 'accompanied by a statement approved by the commissioner.' And the thought in mind here was is [*sic*] several of the—of the carriers were concerned about just how much or—or how little they had to advise their insured of in order to satisfy the requirements of the act. And since the—they are a regulated industry, except in the area of rates, we—we felt that it would be best to have the insurance commissioner make the determination of—of the policy provision, which he already does. Now, this, of course, would not be a policy provision. It would simply be a notice, a separate piece of paper from the policy itself, so as not to require the—the carriers to reprint their policies just for Oregon.

> "* * * * *

> "Rep. Frohnmayer: Now, if the insurance commissioner signs off, that's the end of the dispute though. Is that your understanding, what—?

> "Fender:    That would be our understanding.
>
> "Rep. Frohnmayer:    There's no collateral attack on whether or not it was adequate? There's no fine or penalty for—?
>
> "Fender:    That's—that's correct."

Tape Recording, House Committee on Judiciary, SB 718, June 24, 1977, Tape 55, Side 2. Later in the hearing, William Wheatley, a witness representing State Farm Insurance, gave testimony along the same lines. Wheatley agreed that the content of the required statement should be left to the insurance commissioner:

> "Rep. Myers: If you [State Farm] assume we're going to require you to do this, do you see any problem with having the insurance commissioner approve it? Don't you want that?
>
> "Wheatley:  Well I think, you know—
>
> "Rep. Myers:  Just assume we're going to do it now.
>
> "Wheatley: Okay. Yeah, if you're going to do it, I think that it should either be spelled out with great clarity here or else left to the insurance commissioner to spell out. But to leave it as is is big."

*Id.*

The committee voted to add the words "approved by the commissioner" without further discussion, and no further discussion of that issue appears in the legislative record. The legislature ultimately enacted the bill that used the committee's proposed text. Or Laws 1977, ch 785, § 4. As described above, the word "commissioner" was later changed to "director" to reflect changes in the regulatory structure after adoption.

That legislative history confirms, as an initial matter, that the legislature intended the notice provision to require that the insurer use language approved by the director, and, as a result, an insurer violates the notice provision if the insurer fails to do so. Beyond that, the legislative history undermines plaintiff's interpretation that the notice provision imposes a second distinct obligation on insurers to ensure that the notice sufficiently states

the required information, including the provisions of ORS 746.280. Instead, the legislature required insurers to use language approved by the director in order to *relieve* insurers of the obligation to determine on their own whether the language in the notice was sufficient.

Plaintiff argues that, although Fender testified to the House Judiciary Committee that a notice approved by the director should not be subject to collateral attacks, the text of the bill adopted by the legislature does not support Fender's understanding of the bill. In support of that argument, plaintiff points out that the bill expressly makes the notice subject to collateral attacks by creating the private cause of action. Or Laws 1977, ch 785, § 7, *codified as* ORS 746.300. But that argument, again, somewhat misconceives the question before this court. The question is not whether an insurer can be liable for violating the obligations imposed on it under ORS 746.290(2); it can be, and that is not a "collateral attack." The question is what obligations ORS 746.290(2) imposes on an insurer in the first place. The legislative history reflects that the legislature was concerned about collateral attacks on language that had been "approved by the director" and, therefore, limited the scope of the insurer's obligation to using language that had received such approval.

As a result, we agree with Farmers' interpretation. Regarding the content of the notice, an insurer satisfies the notice provision in ORS 746.290(2) if, and only if, the insurer uses language that has been approved by the director. A plaintiff cannot establish that an insurer violated ORS 746.290(2) by challenging the substantive content of the insurer's notice. Instead, an insurer's liability turns on whether the insurer provided a notice that uses language approved by the director.[5]

In light of that conclusion, this case provides no opportunity for us to decide the second question presented—namely, whether Farmers' notice sufficiently stated "[t]he

---

[5] Our conclusion is limited to ORS 746.290(2). That conclusion is based on the legislative intent specific to that provision and does not reach other provisions within the Insurance Code that may require insurers to obtain the director's approval.

provisions of ORS 746.280." To the extent that plaintiff seeks to challenge whether a notice approved by the director comports with the requirement in ORS 746.290(2) that the notice state "the provisions of ORS 746.280," such a challenge would properly arise, if at all, through a different avenue. *See, e.g.*, ORS 731.240(1) ("The Director of the Department of Consumer and Business Services shall hold a hearing upon written demand for a hearing by a person aggrieved by any act, threatened act or failure of the director to act.").[6]

The trial court's order granting summary judgment to plaintiff and denying summary judgment to Farmers was based on an interpretation of the notice provision in ORS 746.290(2) that conflicts with the legislative history set out above. Plaintiff had sought summary judgment on the ground that Farmers had violated the notice provision by failing to sufficiently state the provisions of ORS 746.280. Farmers argued that it sufficiently stated the provisions of ORS 746.280 and separately sought summary judgment, arguing that it satisfied its obligation under ORS 746.290(2) by providing a notice using language approved by the director. The trial court agreed with plaintiff's argument that, under the notice provision, an insurer has an independent obligation to ensure that the notice sufficiently states the provisions of ORS 746.280 and that Farmers had failed to satisfy that obligation. In concluding that an insurer has an independent obligation to ensure that the notice sufficiently states the provisions of ORS 746.280, the trial court rejected Farmers' argument that Farmers could and did satisfy its obligation under ORS 746.290(2) by providing a notice using language approved by the director.

For the reasons stated above, the trial court erred in concluding that Farmers had an independent obligation to ensure that the notice sufficiently states the provisions of ORS 746.280. The only obligation that ORS 746.290(2)

---

[6] The parties have not briefed the nature of any obligation that ORS 746.290(2) imposes on the director, and we express no view on that issue. Similarly, the parties have not briefed whether the director could approve notice language through formal rulemaking. If the director has authority to do so and adopted a rule approving notice language, then whether the language approved by the director sufficiently states the provisions of ORS 746.280 could be determined through judicial review under ORS 183.400.

imposes on an insurer regarding the content of the notice is to use language approved by the director. Either the insurer used language approved by the director and satisfied the notice provision or the insurer failed to do so and violated the notice provision. Whether the notice sufficiently states the provisions of ORS 746.280 is not material to either of those determinations. Because we hold that an insurer has no independent obligation to ensure that the notice language sufficiently states the provisions of ORS 746.280, we reverse the trial court's order granting plaintiff summary judgment and conclude that the trial court erred in the reason that it gave for denying Farmers' motion for summary judgment.

Nevertheless, we do not reach the question of whether the trial court should have, instead, granted Farmers' motion for summary judgment. That motion consisted of two parts: an argument about the scope of an insurer's obligation under the notice provision and an argument about whether Farmers satisfied that obligation in this case. We agree with Farmers' argument about the scope of an insurer's obligation. An insurer satisfies the content requirement in ORS 746.290(2) if, and only if, the insurer uses language approved by the director. But we do not address whether, in the notices at issue in this case, Farmers actually used language that had been approved by the director.

Neither party has presented this court with sufficiently developed arguments on that question. For example, although Farmers' notice used language tracking the 1993 bulletin issued by the director's predecessor, that bulletin appears to have been withdrawn, along with dozens of other bulletins, as part of a 2003 effort "to reduce the regulatory burden imposed by the Oregon Insurance Division." Bulletin 2003-2 (Mar 10, 2003), 2003 WL 24892185, *1; *see also id.* ("THE FOLLOWING BULLETINS ARE WITHDRAWN: *** 93-3 Approved Anti-direction of Work Notice with Auto Policy"). The parties have not briefed the legal significance, if any, of that 2003 bulletin.

Additionally, in September 2015, after plaintiff filed his claim against Farmers in this case, DCBS began requiring motor vehicle insurers to submit their ORS 746.290(2) notices to DCBS as part of the insurance form preapproval

process. *See* ORS 742.003 (describing insurance form pre-approval process). According to the summary judgment record, Farmers submitted its notice form, using the same language that it had provided to plaintiff and used since 1994. DCBS approved that notice in 2016. The parties have not briefed the legal significance, if any, of that approval or otherwise identified any further guidance from the director between the 2003 bulletin and that 2016 approval. We therefore do not rule on whether the trial court should have granted Farmers' motion for summary judgment.

The dissent disagrees with our answer in this case. But the dissent does not dispute our interpretation of the phrase "approved by the director"—namely, where an insurer is required to state information using language "approved by the director," then the insurer satisfies that obligation by stating the information using language that the director has approved. Instead, the dissent takes the position that the notice must use language approved by the director only in describing the rights and responsibilities of the insured and not in describing the provisions of ORS 746.280.

Again, the notice must provide:

"(2)  *** a statement in clear and conspicuous language approved by the director of:

"(a)  The rights and responsibilities of the insured when a claim is submitted; and

"(b)  The provisions of ORS 746.280."

ORS 746.290(2). The dissent would conclude that the lead-in requirement that the statement be "in clear and conspicuous language approved by the director," or at least the phrase "approved by the director," applies only to paragraph (a); it does not apply to paragraph (b), which, in the dissent's view, requires the notice to include a verbatim copy of the wording of ORS 746.280. The dissent asserts that that interpretation advances the legislature's "purpose," which the dissent understands as the legislature's policy goal—here, to protect the consumer.

We differ with the dissent not because we differ in our understanding of the legislature's objective, but because

we are unwilling to ignore the text that the legislature enacted to advance that objective.

It is clear from the structure and wording of ORS 746.290(2) that the legislature intended to require "a statement" describing two different matters: (a) the rights and responsibilities of the insured when a claim is submitted; and (b) the provisions of ORS 746.280. The required statement must be "in clear and conspicuous language approved by the director." The colon at the end of that phrase, and the fact that paragraphs (a) and (b) are connected with the word "and," indicate that the legislature most certainly intended the phrase "clear and conspicuous language approved by the director" to apply to both parts of the required notice. Although the dissent acknowledges that our interpretation might be "the most natural textual interpretation" of the statute, the dissent nevertheless asserts that its own interpretation is plausible. 373 Or at 339 (James, J., dissenting). That plausibility, however, is not apparent, and the dissent does not try to establish it. Neither plaintiff nor *amicus* contend that the phrase "clear and conspicuous language approved by the director" can be read to apply differently to the two paragraphs of the statute. The only plausible reading of the statute is that the phrase preceding the colon applies equally to both paragraphs.

On that issue, the text is clear. Where the text is clear, then we generally presume that the text reflects the legislature's policy goals and that those goals are best carried out by applying the statute as it is written. *See Gaines*, 346 Or at 171 ("Only the text of a statute receives the consideration and approval of a majority of the members of the legislature[.]"). "[W]e simply do not have authority to rewrite the terms of a statute to accomplish what we may suspect the legislature intended but did not actually enact into law." *Halperin v. Pitts*, 352 Or 482, 496, 287 P3d 1069 (2012); *see also* ORS 174.010 ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted[.]"); *State v. Giron-Cortez*, 372 Or 729, 756, 557 P3d 505 (2024) (James, J., dissenting) ("We are not free to ignore the text of

a statute if we think that the text does not accurately state what the legislature intended. If we did that, we would be rewriting a clear statute based solely on our conjecture that the legislature could not have intended a particular result." (Internal citation and quotation marks omitted.)).

Disregarding clear text in search of "purpose" is perilous. A statute rarely reflects a single policy objective that the legislature intends to be pursued at all costs. Instead, bills often result from "'the accommodation of competing and mutually inconsistent values.' Many bills contain both provisions that advance their principal purposes and provisions that may limit their pursuit of those goals to protect other interests." *State v. Uroza-Zuniga*, 364 Or 682, 692-93, 439 P3d 973 (2019) (quoting Hans A. Linde, *Due Process of Lawmaking*, 55 Neb L Rev 197, 212 (1976)). In those situations, a court that casts aside unambiguous text seeking to understand the statute's "purpose" is at risk of elevating one purpose over another—a policy choice that may upset the balance struck by the legislature.

This case is illustrative. We agree with the dissent that the purpose of the choice-of-shop law is consumer protection—namely, protecting an insured's right to choose a repair shop and requiring insurers and repair shops to notify insureds of that right. But the question presented in this case is about how the legislature intended to carry out that purpose and to what extent. The legislature added the phrase "approved by the director" to address insurer uncertainty about the content of the required notice. In other words, in addition to protecting consumers, the legislature had a second purpose: to provide insurers with certainty about how to meet their statutory obligation. Thus, the legislature intended to advance both purposes by providing insurers a clear path to satisfying their notice obligation to insureds while still punishing insurers who failed to do so.

The dissent interprets the statute, however, by denying or minimizing the insurer uncertainty that prompted the legislature to add the phrase "approved by the director." The dissent posits, without any support in the legislative history, that insurers had (or could have had) uncertainty only with respect to the requirement in paragraph (a) (the

"rights and responsibilities of the insured"). As to paragraph (b), the dissent asserts that "the provisions of ORS 746.280" is unambiguous and can only be interpreted to mean that the notice must recite verbatim the statutory text of ORS 746.280.

The dissent's contention is difficult to square with its separate assertion that text is rarely "so unmistakably clear that no reasonable person could find some uncertainty within it." 373 Or at 337 (James, J, dissenting). And we disagree that the phrase "a statement of * * * the provisions of ORS 746.280" can mean *only* a recitation of every word of the statute. It also could mean a statement that summarizes the provisions or rephrases them in plainer terms. Thus, the dissent's premise that only paragraph (a), and not paragraph (b), has any room for ambiguity is mistaken. Moreover, nothing in the legislative history cited by the dissent suggests that the insurer uncertainty was limited to paragraph (a) or that anyone viewed the two parts of the notice differently in that regard.

Although the dissent frames its disagreement with the majority as a matter of judicial philosophy, that is not how we see it. Considering the legislature's policy goals is a normal part of our framework for interpreting statutes, and, in fact, the "paramount goal" of statutory interpretation is "discerning the legislature's intent." *Gaines*, 346 Or at 171. But a court cannot faithfully carry out that intent by choosing for itself how best to accomplish legislative goals, ignoring the means by which the legislature has chosen to do so.

The decision of the Court of Appeals is reversed in part. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**JAMES, J.,** dissenting.

ORS 746.290(2) provides:

"Every motor vehicle liability insurance policy issued in this state after December 31, 1977, and any extension or renewal after that date of a policy issued before that date shall be accompanied by a statement in clear and conspicuous language approved by the director of:

"(a)   The rights and responsibilities of the insured when a claim is submitted; and

"(b)   The provisions of ORS 746.280."

This case concerns the phrase "in clear and conspicuous language approved by the director," and what that phrase means—does it apply to both paragraphs (2)(a) and (2)(b), or only paragraph (2)(a)? The majority concludes that it applies to both, holding that "an insurer satisfies its obligation under ORS 746.290(2) if, and only if, the insurer uses language approved by the director. Whether the language approved by the director omits some of the information described in the statute is immaterial to the insurer's liability." 373 Or at 309. The crux of the dispute, therefore, is *accuracy*, and who bears the obligation to *accurately* inform the consumer about "[t]he provisions of ORS 746.280."

Under the majority's reasoning, informing Oregon consumers, accurately, of "[t]he provisions of ORS 746.280," is entirely the obligation of the director. Insurance companies could intentionally misrepresent—*i.e.*, lie—to their insureds about the contents of ORS 746.280. They could send insureds *an entirely different statute* without consequence, so long as the director had accidentally approved it. The requirement to provide "[t]he provisions of ORS 746.280" is not a requirement for insurers to accurately inform consumers about that statute; it is only a requirement to pass along the language of the director. In this way, the majority interprets ORS 746.290(2) as a regulatory scheme that places the burden for, and the consequences of, accurately informing Oregon insureds of "[t]he provisions of ORS 746.280," on the director, *not* the insurance industry. I must respectfully dissent.

Perhaps the majority's interpretation of "in clear and conspicuous language approved by the director" is grammatically supportable, but I part ways with the majority for one reason: purpose. As I will explain, in my own judicial philosophy, in cases such as this where reasonable minds can and do read a text in multiple ways, the purpose that gave rise to the statute exerts the strongest gravitational pull on my decision-making.

BACKGROUND

Oregon has a long history of insurance providers failing to fully and accurately inform consumers about their automobile repair rights. This has been so widespread, and so pervasive, that the Oregon legislature has had to step in and protect consumers on multiple occasions over decades.

In 1977, the Oregon legislature first enacted a consumer protection bill—an "anti-steering" law—one aimed at "protect[ing] the insurance-buying public," *see* ORS 731.008, by prohibiting insurers from steering insureds to have their vehicles repaired at specific motor vehicle repair shops. *See generally* Or Laws 1977, ch 785, *codified as* ORS ch 746 (1977). The 1977 anti-steering law sought to regulate—and penalize—the insurance industry, for the benefit of consumers, by creating three things: a substantive right to repair, a notice provision, and a penalty for insurers who violated the law. The substantive right provided insureds with the right to recover under their automobile insurance policy without regard to the shop at which they chose to have their vehicle repaired. The notice provision required that insurers advise insureds of the substantive right by including in every automobile insurance policy issued, extended, or renewed after December 31, 1977, "a statement in clear and conspicuous language" of the substantive right. Or Laws 1977, ch 785, § 3, *codified as* ORS 746.290 (1977). The notice accompanying the insured's policy ("the policy notice") was required to be printed separately from the policy; it could not simply be included in the policy document. *Id.* The penalty the legislature chose to impose against insurance companies for violations of the substantive right or notice provision was "actual damages or $100, whichever is greater, for each violation." Or Laws 1977, ch 785, § 7.

The problem of insurers subverting the repair rights of Oregon consumers did not stop. Between 1977 and 2007, insurance companies created "Direct Repair Programs." Through their Direct Repair Programs, insurers created lists of "preferred" repair shops at which the insurer had prenegotiated service prices and procedures. To be on an insurer's Direct Repair Program list, repair shops often were required to agree to the insurer's repair procedures

and timelines, charge discounted prices, and use cheaper, aftermarket parts and materials, compromising the safety and quality of the vehicle repair. *See generally* Testimony, Senate Committee on Commerce, SB 523, Mar 5, 2007, Ex D (statement of Fred Linenko, Specialty Auto Body, Inc.). Because Direct Repair Program shops were required by insurers to reduce labor rates, repair shops were pressured to perform repairs quickly, further compromising quality. *Id*. Ex C (statement of Jack Isselmann, Oregonians for Safe Auto Repair). Insureds often were not informed of the Direct Repair Program relationship or the insurer's requirements regarding rates, repair procedures, or other discounts that the Direct Repair Program shops had to absorb to maintain their status on a Direct Repair Program list. *Id*.

Thus, in 2007, the Oregon legislature convened, again, to further regulate insurance providers by enacting more consumer protection laws. To help solve the problem created by those insurance industry practices, and to create additional transparency and consumer protections beyond those afforded under the 1977 law, the Oregon legislature in 2007 amended the substantive rights afforded under ORS 746.280 to include an additional substantive right and more frequent notice about the insureds' rights to use a vehicle repair shop of their choice.

Specifically, ORS 746.280 was amended to make clear that, if an insured elects to have their vehicle repaired at a shop other than one recommended by the insurer, the insurer "may not limit the cost of repairs necessary to return the motor vehicle to a preloss condition relative to safety, function and appearance" other than as stated in the insurance policy or otherwise permitted by law. ORS 746.280(3). It was also amended through subsections (2) and (4) to specify the notice to which insureds are entitled.

Importantly, the 2007 amendments did not lessen the law's 1977 policy notice requirement—*i.e.*, the requirement that the insurer provide the insured with a separately stated notice fully setting forth in clear and conspicuous language the substantive rights the law affords. ORS 746.290(2)(b). And with the passage of new protections in 2007, those

notices, including the "provisions of ORS 746.280" needed to change; for this insurer, they did not.

That brings us to this suit, and our central question: In light of the multiple attempts to regulate insurers, and to penalize them for providing inaccurate information to Oregon consumers, how do we interpret the phrase "in clear and conspicuous language approved by the director," as it appears in the requirement of ORS 746.290(2)(b) to provide the "provisions of ORS 746.280?"

## PHILOSOPHIES OF STATUTORY INTERPRETATION

Statutory interpretation is a literary exercise that, like all literary exercises, seeks to find meaning in a text. Countless academic endeavors have debated the proper approach to divining meaning. Within the legal field, approaches to finding meaning within a statute have settled across a spectrum. At one end of that spectrum sits textualism. In its purest form, textualism holds that it is inappropriate to ever consider legislative history, let alone statutory purpose. The other end of the spectrum is less clearly labeled, but there is some consensus on the term "purposivism." Extreme purposivism, at the other end, will take the extraordinary step to judicially alter substantive provisions of a statutory text to conform to the legislative purpose. From textualism to purposivism, every point on the philosophical spectrum can find its adherents, and legitimate arguments in support.

This court articulated an approach to statutory interpretation, partially grounded in ORS 174.020, in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611-12, 859 P2d 1143 (1993).[1] *PGE*'s announced method was a subset of the statutory interpretive philosophical spectrum, permitting a consideration of legislative history only when the text was ambiguous. *See id.* at 612-13 ("If, but only if, the intent of the legislature is not clear from the text and context inquiry, the court will then move to the second level, which is to consider legislative history to inform the court's

---

[1] PGE described this method as the method of "the court." *PGE*, 317 Or at 610. Whether institutions, as opposed to people, can have philosophies, or mandate a collective philosophy upon its members, is an interesting question, but one I do not need to delve into here.

inquiry into legislative intent."). *PGE* was not an articulation of a pure textualist approach, but the gravity of its orbit was towards the textualist end of the spectrum.

In response, the legislature amended ORS 174.020 to make clear its desire that courts permissibly consider legislative history in all instances, not just when text and context fail to resolve the issue. The legislature retained its entreaty that courts should pursue "the intention of the legislature *if possible*." ORS 174.020(1)(a) (emphasis added).[2] The legislature also retained its preference that courts construe statutes to give effect to the "substance" contained therein, and not "insert what has been omitted, [nor] omit what has been inserted." ORS 174.010. The legislature's response to *PGE* was eventually recognized by us in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009).

In this way, Oregon's statutory interpretive scheme can be seen as permitting judges the full array of the philosophical spectrum, omitting the extreme positions on either end. Strict textualism's refusal to consider legislative history is rejected, while extreme purposivism's willingness to judicially redraft substantive provisions of legislation is also rejected. But between those two polar ends sits a wide field of thought, approach, and weight, and each judge must locate themselves within it. As we noted in *Gaines*, Oregon's approach "[strikes] a delicate balance between the legislature's role in ensuring that its enactments are interpreted in the way that the legislature intended and the court's independent role in performing that interpretive exercise." *Id.* at 168.

I think, perhaps, we as judges do not talk often enough, in clear and conspicuous language, about where we exist on that philosophical spectrum. For me, it is important, particularly in a system where judges are elected and responsible to the public, that I do so. I do so both for transparency and personal accountability. Like all my colleagues, it is my desire, in each case, to reason *from* a principle, not *towards* a result. Articulating a philosophy is a way to attempt to minimize, for my own decision-making, what

---

[2] We frequently cite ORS 174.020(1)(a), but we often leave out the "if possible" ending to the sentence.

Justice Durham called the "frank but all-too-true" empirical observation of Professors Hart and Sacks:

> "Do not expect anybody's theory of statutory interpretation, whether it is your own or somebody else's, to be an accurate statement of what courts actually do with statutes. The hard truth of the matter is that American courts have no intelligible, generally accepted, and consistently applied theory of statutory interpretation."

*Carlson v. Myers*, 327 Or 213, 232 n 5, 959 P2d 31 (1998) (Durham, J., concurring) (citing Henry M. Hart, Jr. and Albert M. Sacks, *The Legal Process: Basic Problems in the Making and Application of Law*, 1169 (William N. Eskridge, Jr. & Phillip P. Frickey eds., 2d ed 1994)). This case provides me such an opportunity, and in the interest of transparency, I will take it. In deciding how to approach a question of statutory meaning within the *Gaines* approach, and especially in close or difficult cases, I find that purposivism exerts the strongest pull on my reasoning.

Purposivism, broadly, "reminds the judge * * * that it is in [the legislature], not the courts, where the Constitution places the authority to enact a statute." Stephen Breyer, *Our Democratic Constitution*, 77 NYU L Rev 245, 266 (2002); *see also* Peter L. Strauss, Essay, *The Courts and the Congress: Should Judges Disdain Political History*, 98 Colum L Rev 242, 252-53 (1998) (arguing that purposivism makes courts the most effective agents of the legislature). The purposivist approach, perhaps most famously articulated by Henry Hart and Albert Sacks, traces its ancestry to at least the 1500's and Heydon's Case, 76 Eng Rep 637 (Ex 1584). Heydon's Case articulated the mischief rule—that in construing a statute, courts first look to the mischief to which the statute was directed, and then to interpret the statute to advance the drafters' purposes in responding to that mischief. The mischief rule was foundational to Blackstone, who professed that "the most universal and effectual way of discovering the true meaning of a law, when the words are dubious, is by considering the reason and spirit of it; or the cause which moved the legislator to enact it. For when this reason ceases, the law itself ought likewise to cease with it." 1

William Blackstone, *Commentaries on the Laws of England* *61-62 (footnotes omitted).

In searching for the meaning of a statute, purposivism approaches statutes as essentially reactive in nature. Unlike a constitution, which is more foundational and aspirational, statutes come about because legislators perceive a specific social need, and craft legislation *in response* to that perceived social need. *See, e.g.,* Hart & Sacks, *The Legal Process* at 1378. Accordingly, for purposivism, statutory interpretation begins, not with text, but with social background. It is imperative to first understand what prompted the legislature to action, and to interpret through that lens, wherever possible, the enacted statute in furtherance of the legislative purpose that prompted it.

Purposivism is grounded in pragmatism and realism. In a search for statutory meaning, the purposivist approach recognizes that text and language is imperfect. As Justice Holmes noted, "[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner*, 245 US 418, 425, 38 S Ct 158, 62 L Ed 372 (1918). The imperfection of language is further complicated by the realities of the legislative process. Legislation is drafted, as a collective effort, by a citizen legislature, often with outside pressure and tinkering, frequently resulting in language that is more an expression of a collective belief about what a bill will do, rather than language meticulously chosen to actually do the thing.[3]

Finally, although they are certainly similar and closely aligned, purposivism is not completely synonymous with intentionalism:

---

[3] I have written previously about the cognitive bias of lawyers and judges to read legal technicalities and complexity into legislative language, where perhaps none was intended. *See, e.g.*, *Marshall v. PricewaterhouseCoopers, LLP*, 371 Or 536, 560-61, 539 P3d 766 (2023) (James, J., dissenting) ("Although many members of that body are lawyers, the vast majority are not. And although the legislature is advised by lawyers in the Legislative Counsel's Office, the general drafting guidelines of that office set the expectation to legislative members that terms that give rise to legally specific meanings typically should be avoided.").

"The intentionalist regards the goal of statutory interpretation as being to discern and implement the intent of the legislature. The intentionalist does not ignore statutory text, but neither does she regard the text as simply being the law, independent of the intent behind it, because 'in rare cases the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those *intentions* must be controlling.' Thus, the intentionalist regards legislative intent—not statutory text—as the ultimate determinant of the law."

Jonathan Siegel, *The Inexorable Radicalization of Textualism*, 158 U Pa L Rev 117, 123 (2009) (footnotes omitted; quoting *Griffin v. Oceanic Contractors, Inc*, 458 US 564, 571, 102 S Ct 3245, 73 L Ed 2d 973 (1982).

In contrast, purposivism has been described as an approach under which

"a court interpreting a statute should '[d]ecide what purpose ought to be attributed to the statute and * * * [i]nterpret the words of the statute immediately in question so as to carry out the purpose as best it can.' [Hart & Sacks, *The Legal Process* at 1374.] Statutes, purposivists believe, should 'be presumed to be the work of reasonable [people] pursuing reasonable purposes reasonably.' [*Id*. at 1125.] The meaning of a statute can 'never [be] plain unless it fits with some intelligible purpose.' [*Id*. at 1124 (italics omitted).]"

*Id*. at 124 (footnotes omitted).

Purposivism is not, therefore, just another word for legislative intent. First, legislative intent is all too often confined to the intent of a particular legislative body existing in a specific time. Purposivism, by contrast, looks to the social situation that prompts legislative action, and, accordingly, recognizes that a body of law can be created over time, in incremental response—the work of the "Legislature" writ large, as an institution—that goes beyond the subjective intent of any particular group of elected representatives on a particular date. By shifting focus away from the exclusive intent of a single legislature to the actions of the legislature over time, purposivism may read more into subsequent legislative action, or inaction, in the search for statutory meaning.

Second, purposivism and intentionalism may differ in seeing textual ambiguity at all. Legislative intentionalism typically espouses that "[a] statute's text is the best indicator of legislative intent." *Oregon Trucking Assns. v. Dept. of Transportation*, 364 Or 210, 220, 432 P3d 1080 (2019). Through a purposivist lens, however, that statement is neither particularly helpful, nor frankly accurate. Text is an attempted expression of intent, but it is imperfect, as previously discussed. And rarely is text so unmistakably clear that no reasonable person could find some uncertainty within it. "A statute may be ambiguous for any number of reasons—whether lexical, syntactical, referential, semantic, or vague in the linguistic sense. The courts refer to all of those different forms of indeterminacy as 'ambiguity.'" Jack L Landau, *Oregon Statutory Construction*, 97 Or L Rev 583, 616 (2019). This is further exacerbated when we consider "latent ambiguity"—ambiguity that does not appear directly in the words of a statute but only emerges from considering the perspective provided by external facts or circumstances. Latent ambiguity of punctuation, in particular, is not uncommon to find, when statutes are viewed through the lens of their purpose, as noted by the United States Supreme Court itself: "Punctuation is a minor, and not a controlling element in interpretation, and courts will disregard the punctuation of a statute, or re-punctuate it, if need be, to give effect to what otherwise appears to be its purpose and true meaning." *Barrett v. Van Pelt*, 268 US 85, 91, 45 S Ct 437, 69 L Ed 857 (1925) (internal citations omitted).

But most importantly, in differentiating intentionalism from purposivism, we must remember that statutory interpretation is a search for *meaning*, and meaning is not exclusively found in the intent of the writer. Meaning is a broader inquiry—one that considers the intent of the writer, the likely understanding of the reader, the context of the communication, and the underlying purpose that prompted the utterance in the first instance.

In sum, my purposivist approach to statutory interpretation begins with the social background—the purpose of the legislation—not the text. It sees text as an imperfect tool applied in response to that purpose. Centering that purpose,

while still respecting the legislatively requested boundary that substantive text neither be omitted, nor inserted, *see* ORS 174.010, text should be liberally construed, or ambiguity perceived, if doing so is necessary to align the text with that purpose.

## APPLICATION

Having, perhaps clumsily, explained my purposivist approach, I will explain why it leads me to parting ways with the majority. ORS 746.290(2) regulates, and penalizes, insurance companies who fail to accurately inform Oregonians of their repair rights. It is a consumer protection statute that regulates the insurance industry. That is its *purpose*. It came into existence because insurance companies, not the director, were being less than fully accurate with Oregon consumers.

When the legislature passed SB 718 in 1977, it was well aware that it was imposing additional requirements on an already highly regulated industry. *See* ORS 731.004 (defining the "Insurance Code" to consist of ORS chapters 731, 732, 733, 734, 735, 737, 743, 744, 746, 748, 750, and 751). And those regulations, read consistently with the declared legislative purpose set out in ORS 731.008 that "the Insurance Code is for the protection of the insurance-buying public," had still left the public vulnerable to the insurance companies' practices of steering claimants to particular repair shops. Clearly, the regulator and regulated community had not sufficiently protected the public, requiring the legislature to impose the requirement that "the provisions of ORS 746.280" be provided to the insurance-buying public "in clear and conspicuous language approved by the director."

The legislature did not convene in 1977, nor again in 2007, to regulate the insurance director. It had not been the insurance director who had been inaccurately advising Oregon consumers for decades. The purpose of the regulation in 1977, and again in 2007, was to regulate, and penalize, insurers who misinformed Oregon consumers about their rights. Nothing evidences that the legislature threw up its hands, believing the insurance industry could not be required to accurately inform Oregon consumers, and

instead turned the responsibility for accurately informing Oregonians entirely over to the director.

The majority turns ORS 746.290 on its head, and makes it, instead, a statute to protect insurance companies—protecting them even if they knowingly mislead Oregon consumers about the letter of the law, so long as the insurance commissioner approved the deception. The majority reads the phrase "in clear and conspicuous language approved by the director" as applying to both the requirements contained in paragraphs 2(a) and 2(b). Perhaps that is a defensible position. Perhaps, as the majority argues, it may even be the most natural textual interpretation of the phrase. But, in a search for meaning grounded in purpose, there is another potential reading: We can read the phrase "in clear and conspicuous language approved by the director" as applying only to paragraph (2)(a)—the notice of rights and responsibilities. In my view, that interpretation better serves the purpose of the legislation. I see nothing in the purpose of the statute, which is to accurately inform consumers of their rights, by informing them of a very specific statute, that would empower insurance companies to disregard the explicit statutory requirement contained in paragraph (2)(b) to include in insurers' notices to Oregonians "[t]he provisions of ORS 756.280," regardless of whatever model language the director had promulgated.

The majority relies on discussions that occurred in committee in 1977, specifically that "insurers had expressed concern about the uncertain scope of the required notice in the draft bill. *** [I]nsurers feared that without clear statutory direction on the content required to be in the notice, insurers would have no certainty before issuing the new notices that the notices complied with the statute." 373 Or at 320. But nothing in those discussions evidence that anyone was uncertain as to the scope or requirements of paragraph (2)(b). I cannot find a single instance in the legislative record that any witness, nor any legislator, perceived any lack of clarity in the mandate to provide consumers the "[t]he provisions of ORS 756.280." Rather, the entire discussion about any need for a safe harbor of director-approved language came in response to paragraph (2)(a), the "rights and responsibilities."

But as to paragraph (2)(b), there is nothing vague about that paragraph. There is no need for the director's clarity, or to have the director approve language. The only permissible language is set forth by the legislature itself—the clear, definite, and unarguable language of the statute as it exists in print. And looking again to the purpose of the regulatory scheme, who bears the consequence for the failure to include that language? It is the insurers.

When it was enacted in 1977, the statements on the floor of the Oregon House of Representatives make it clear that the onus to inform was on the insurers, not the director:

> "In section 4 we're going also further in the disclosure area by requiring that adjusters who are adjusting a particular insured loss advise the individuals (the insureds) advise their insureds that you cannot have the direction and control, in other words, if you do that you do not have to have your car repaired at a specific shop and finally there has to be notification in the policy itself in plain and understandable language both of this fact and what the insured's rights and obligations are as well as the shares rights and obligations are under the policy."

Tape Recording, House Floor Debate, SB 718, July 2, 1977, Tape 38, Side 2 (statement of Rep Lombard).

And on the Senate side, floor statements make it clear that the onus to inform was on the insurers:

> "Mr. President, this was a bill that would prohibit insurers from requiring particular persons to make repairs on their automobile. This came from the house amendments were made in the House Judiciary Committee \*\*\*. The house amendments removed third party claimants and the bill now clearly defines the relationship between the insurers and the insured. Reciprocal responsibilities were imposed upon both insurance companies and the auto body shops as well. Insurance company [*sic*; probably insurance commissioner] is directed to study the extent of any of insurance company financier involvement with auto body shop and report to the legislature with its recommendations as to actions that may be needed. *The bill requires insurance companies to make full disclosure to the insured as to his right to have his vehicle repaired at a shop of his choice*."

Tape Recording, Senate Floor Debate, SB 718, July 2, 1977, Tape 54, Side 1 (statement of Sen Groener) (emphasis added).

We can see this in Bulletin 93-3, in which the Insurance Division of the Oregon Department of Insurance and Finance expressly told insurers the following:

"*This example is not the only acceptable language.* If you choose to use this language, it is not necessary to submit notice language for the director's approval.

"Failure to comply with these statutes could result in a fine of up to $10,000 for each offense. Moreover, ORS 746.300 provides:

"An insured whose insurer violates ORS 746.280 or 746.290, or a customer whose motor vehicle body and frame repair shop violates ORS 746.292, may file an action to recover actual damages or $100, whichever is greater, for each violation. Any person who brings an action under this section may also recover costs, necessary disbursements and reasonable attorney fees at trial and on appeal as determined by the court.

"If you have not yet complied with ORS 746.290(2), you must enclose the insert with a full cycle of renewals to ensure that all insureds have received the notice of prohibition at least once."[4]

Oregon Insurance Division Bulletin 93-3, 1993 WL 13563876 (Apr 20, 1993) (emphasis added).

In short, the purpose of the regulatory scheme is to place the burden to accurately inform Oregon consumers of the contents of ORS 746.280, on insurers. Accordingly, an insurer fails their statutory obligation when they fail to accurately inform Oregonians about the contents of ORS 746.280. Both the trial court, and the Court of Appeals, correctly, determined that that had occurred here. The Oregon Legislature crafted those consumer protections over decades, in response to real, ongoing, abuses by the insurance industry. Today, I fear that we weaken them. For all of the reasons stated above, I cannot join the majority. In my view, it fails to center the "protection of the insurance-buying

---

[4] That bulletin was ultimately withdrawn, leaving insurers no choice but to send their own language.

public" consistent with the purpose of ORS 746.290(2) and the Insurance Code.

Accordingly, I respectfully dissent.

Masih, J., joins in this dissenting opinion.